# Richmond.

PEARSON AND OTHERS *v.* BOARD OF SUPERVISORS OF BRUNS-
WICK COUNTY AND OTHERS.

APRIL 11, 1895.

1. ELECTIONS—*Suffrage—Constitution of Virginia—Legislative Powers.*—The
right of suffrage is derived from the Constitution of the State, and to it
we look to ascertain who may, or who may not, vote. The legislature
cannot, directly or indirectly, prescribe any qualifications additional to
those found in the Constitution, and, as no educational qualification is
prescribed by the Constitution, none can be required by the legislature.
The sole function of the legislature, with respect to the exercise of the
right of suffrage, is to provide the method of voting, and to guard
against improper, illegal or fraudulent voting, and to this end it may
adopt and enforce reasonable rules and regulations. But a regulation
which virtually establishes a test of qualification of the voter, additional
to those prescribed in the Constitution, is unconstitutional, and there-
fore void.

2. ELECTIONS—*Act of March 6, 1894—Independence of Voter.*—The act of
assembly, approved March 6, 1894, "to provide for the method of voting
by ballot," does not contravene any of the propositions stated above.
The general scheme of the act is to secure the independence of the voter,
by the safeguards provided by the act, which appear to be not only
reasonable, but well adapted to secure the end in view to all classes of
voters.

3. ELECTIONS—*Act of March 6, 1894—Special Constables—Blind and Illiterate
Voters—" May " in Section 15 Mandatory.*—The special constables pro-
vided for in said act are sworn officers, charged with a duty to the public
of the gravest and most delicate nature, in which every citizen of the
Commonwealth is interested, and severe penalties are denounced against
them for a violation of their duties. Amongst these is the duty to
render to him who is blind, or unable by defective education to read,
every assistance asked for and required by the elector to aid him in pre-

paring his ballot. The word "may," used in the fifteenth section of the act, relating to the duties of special constables, is mandatory and not merely permissive and directory.

4. ELECTIONS—*Act of March 6, 1894—Special Constables—Secrecy of Ballot.*—The oath of office of the constable appointed under said act binds him to the performance of the duties imposed upon him not only by statute, but by the Constitution. He must observe and respect all the rights of the voter, and amongst these not the least important is to have the secrecy of his ballot kept inviolate; and for a breach of this duty upon the part of the constable, he will become amenable to all the pains and penalties provided by law.

5. ELECTIONS—*Act of March 6, 1894—Secret Ballot—Special Constables.*—A vote by ballot *ex vi termini* implies a secret ballot. The secrecy of the ballot is a right which inheres in the voter and of which he cannot be lawfully deprived against his will. But the right to vote is the main object to be attained, and it must not be defeated by too rigid an observance of the incidental right of secrecy. A blind man, or a man unable to read, must, in the nature of things, so far compromise the secrecy of his ballot as to invoke and obtain the aid of others in the preparation of his ballot. This aid the law requires the special constable to render, and this confidence the voter is required to repose in him. But these requirements do not violate the secrecy of ballot guaranteed to the voter.

6. ELECTIONS—*Act of March 6, 1894—Booths—Voting Precincts—Limit of Time to Prepare Ballots.*—The act places no limit on the number of booths that may be supplied, and the county courts have full power to multiply the voting precincts to meet the necessities of the people. A limit to the time for the preparation of ballots was an obvious necessity for which the legislature had a right to provide, and the court cannot, as a proposition of law, decide that the time allowed by the statute is inadequate.

7. CONSTITUTIONAL LAW—*Act Valid in Part and Void in Part.*—An act may be constitutional in one part and unconstitutional in another; but if the unconstitutional parts are unnecessary to the main purpose of the act, and are separable from it, so that they may be suppressed and yet leave the residue of the act in full force and vigor, this will be done, and the unobjectionable parts of the act will be upheld and enforced. If the provision of the act of March 6, 1894, which authorizes special constables to make arrests on the verbal order or warrant of the judges of election be unconstitutional (a question not decided), the unconstitutionality of that provision would not invalidate the other provisions of the act not in conflict with the Constitution.

8. CONSTITUTIONAL LAW—*Act of March 6, 1894—Not in Conflict with Certain Sections of Constitution of Virginia, nor with Amendment XIV to Constitution of the United States.*—The act of assembly, approved March 6, 1894,

entitled "an act to provide for the method of voting by ballot," is a valid act. It is not in conflict with Article III, sections 1 and 2 of the Constitution of Virginia, nor with Article I, section 20, nor with Article I, section 8, of said Constitution. Nor is it in conflict with Article XIV of the Amendments to the Constitution of the United States.

9. CHANCERY JURISDICTION—*Adequate Remedy at Law—Claims Against County.*—A plain and adequate remedy is provided by section 836 of the Code, for relief against the improper allowance by the board of supervisors of a county, of a claim which for any reasons ought not to be allowed. And a bill in equity will not be entertained to enjoin the payment of any such claim.

Petition for an appeal from a decree of the Circuit Court of Brunswick county, in a suit in chancery, wherein the petitioners were the complainants and the Board of Supervisors of Brunswick county and others were the defendants.

*Appeal refused.*

The object of this suit is to test the validity of an act of the General Assembly, approved March 6, 1894, entitled, "An act to provide for the method of voting by ballot." The sections of the act which were drawn in question are 3, 4, 9, 10, 11, 12, 13, and 15, and are in the following words:

"3. The ballot shall be a white paper ticket, containing the names of the persons who have complied with the provisions of this act as hereinafter provided, and the title of the office printed or written as hereinafter provided. None other shall be a legal ballot.

"4. Any person who intends to be a candidate for any office, State or national, to be elected by the electors of the State at large, or of a congressional district, shall, at least twenty days before such election, notify the Secretary of the Commonwealth, in writing, properly attested, of such intention, designating the office for which he be a candidate. Such written notice shall be signed by the said candidate, but if he be incapable of writing his proper signature, then some mark adopted by him as his signature shall be acknowledged before a justice of the peace, or other officer authorized to take acknowledgments to deeds, and in the same manner. Any person who intends to be a candidate for any office not embraced in the foregoing at any

election shall give a similar notice at least twenty days before such election to the clerk or clerks of the county or hustings courts of the various county or counties, or the city or cities whose electors vote for the candidate for such office. No person not announcing his candidacy as provided for above shall have his name printed on the ballots provided for such election. On receipt of the foregoing notice it shall be the duty of the Secretary of the Commonwealth to immediately notify the secretary of each electoral board of each county or city of the State, or of said congressional district.

"9. It shall be the duty of the electoral board of the several counties and cities to provide at each of the voting places in their respective counties and cities a small compartment or booth, large enough to contain and conceal from general observation a voter, and a desk or other convenience for writing. In said booth there shall be placed pen and ink. Said compartment or booth shall be so erected that a person standing at said desk in said booth or compartment shall be wholly excluded from the observation of the clerks, judges of election and other persons. The said board, in its discretion, may have one or more of said booths at said voting places.

"10. Except as hereinafter provided for, save the judges of election and clerks allowed by law, no person other than the elector offering to vote shall be within forty feet of the ballot-box. The judges of election shall promptly decide any dispute as to the precedence of electors to the right to vote, deciding who first offered ; or, if two or more offered at the same time, selecting the one to whom precedence shall be given ; but in case of a challenge, the challengers and challenged and the witnesses may appear before the judges; when such challenge is decided only the elector having the right to vote shall remain within the prescribed limits.

"11. Every elector qualified to vote at a precinct shall, when he so demands, be furnished with an official ballot by one of the judges of election selected for that duty by a majority of the judges present. The said elector shall then take the said official ballot and retire to said voting booth. He shall then draw a line with a pen or pencil through the names of the candidates he does not wish to vote for, leaving the name or names of the candidate or candidates he does wish to vote for unscratched. No name shall be considered scratched unless the pen or pencil mark extend through three-fourths of the length of said name, and no ballot save an official ballot above provided for shall be counted for any person. When, as to any office, more than one name remains unscratched the ballot for that particular office shall be void, but the ballot as to any other office for which only one name remains unscratched shall be valid. He shall fold said ballot, with the names of the candidates on the inside, and hand the same to the judge of election, who shall place the same in the ballot-box, without any inspection, further than to assure himself that said ballot is a genuine ballot, for which purpose he may, without looking at the printed inside of said ballot, inspect the official seal upon the back thereof : provided, it shall be lawful for any voter to

erase any or all names printed upon said official ballot and substitute therein in writing the name of any person or persons for any office for which he may desire to vote.

"12. It shall be unlawful for any elector to carry the official ballot furnished him by the judge of election further than the voting booth, and should he, after inspecting said ballot conclude not to vote, he must immediately return said ballot to the judges of election. Except as hereinafter provided, no person shall advise, counsel or assist any elector, by writing, word or gesture, as to how he shall vote or mark his ballot after the same has been delivered to him by the judges of election. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than five hundred nor more than one thousand dollars and confined in jail six months. To carry any official ballot beyond the voting booth, or away from said booth, except to the judges of election, or to vote any ballot except such as shall be received by the elector from the judge of election, shall be a misdemeanor punishable by a fine of one hundred dollars; and it shall be the duty of the judges of election to cause by verbal order or warrant the instant arrest of any person making such attempt, and he shall be required to vote or surrender said ballot, and he may be confined in jail, by the order of said judges of election, until he obeys said requirement, not exceeding ten days.

"13. No elector shall be allowed by the judges of election to remain in said voting booth provided in this act more than two and one-half minutes to the obstruction of other electors desiring to vote. Said judges of election shall cause any elector attempting to occupy said voting booth for a longer time to require [retire] and surrender his ballot, and he shall not again be allowed to receive an official ballot, unless, in the discretion of the judges of election, another opportunity to vote will not delay or hinder other electors.

"15. The electoral board of each county or city shall appoint for each voting precinct therein one special constable, who shall be an honest and discreet person of said precinct, and be able to read and write, and who shall be a conservator of the peace, and shall be especially charged with enforcing the provisions of this act, having all the powers of a constable; and for such services he shall be allowed one dollar per day. He shall have the power of arresting, upon the verbal order or warrant of the judges of election, or a majority of them, of the precinct to which he is appointed, any person who is offending or attempting to violate any of the provisions of this act, or disturbing the peace, and the person so arrested shall be taken as soon as possible before a justice of the peace having cognizance of the offense, and be then proceeded against under the general laws of the state. At the request of any elector in the voting booth who may be physically or educationally unable to vote, the said special constable may render him assistance by reading the names and offices on the ballot and pointing out to him the name or names he may wish to strike out, or otherwise aid him in

preparing his ballot.  In case said elector be blind, said special constable shall prepare said ballot for said elector in accordance with the instructions of said elector.  Before entering upon the duties of his office, the said special constable shall take an oath to faithfully perform the duties thereof, and for a corrupt violation of the same he shall be deemed guilty of a misdemeanor, and be fined not less than five hundred dollars and be imprisoned not less than one nor more than twelve months in jail."

The opinion states the case.

*E. P. Buford*, for petitioners.

KEITH, P., delivered the opinion of the court.

The plaintiffs filed their bill in the Circuit Court of Brunswick, alleging that they are citizens and taxpayers of that county, and that they are duly qualified voters under the Constituton of the State of Virginia.  They allege that on the 6th of November, 1894, that being the day fixed by law for the purpose, an election was held at the various precincts in the county of Brunswick, as well as throughout the Fourth Congressional District of Virginia, for the election of a Representative in the Congress of the United States, which election was held under the provisions of an act of the General Assembly of Virginia, entitled "An act to provide for the method of voting by ballot," approved March 6, 1894.  The bill goes on to state that expenses were incurred in payment of the *per diem* of certain officers, the preparation of ballots, the construction of booths, and other items incidental to an election under the terms of the law referred to, and that on the 8th of December, 1894, the bills covering these expenses were presented to and allowed by the Board of Supervisors, and warrants were drawn by the board upon the treasurer of the county for their payment.  The plaintiffs further allege that the act under which these expenses were incurred is un-

constitutional and void, and that they cannot therefore be paid out of the general county levy.

The bill states many particulars in which it is supposed that the act is repugnant to the Constitution of the United States and to that of the State of Virginia. The Board of Supervisors and the Treasurer of Brunswick county, the members of the Electoral Board, the special constables who conducted the election, and generally all those holding warrants upon the Treasurer, whose validity is here denied, are made parties defendants.

The bill was taken for confessed, and came on to be heard before the Circuit Court of Brunswick county, which refused the injunction prayed for, and dismissed the bill. Thereupon, the plaintiffs presented their petition for an appeal to this court, which brings the case before us for consideration.

The petition alleges "that the said act is unconstitutional and void; that the costs of conducting the said election, incurred by putting in operation the provisions of the said act, are illegal charges upon the county levy, and the payment thereof should be enjoined; and that the said decree of the said Circuit Court is erroneous for the following reasons, which reasons are assigned as errors in the said decree:

"1. Because the said act establishes physical and educational qualifications for electors in violation of Article III, Section 1, of the Constitution of Virginia.

"2. Because said act deprives such electors as may be blind, or physically or educationally unable to vote, of the secrecy of their ballots, in violation of Article III, Section 2, of the Constitution of Virginia.

"3. Because said act prescribes restrictions upon the eligibility to office forbidden by the Constitution of Virginia, and is, therefore, in violation of Article III, Section 2, of said Constitution.

"4. Because said act deprives the electors of equality of

civil and political rights and public privileges, in violation of Article I, Section 20, of the Constitution of Virginia.

"5. Because said act is repugnant to the guarantees of liberty of speech and of the press, in violation of Article I, Section 14, and Article V, Section 14, of the Constitution of Virginia.

"6. Because said act denies to blind electors, and electors who are physically or educationally unable to vote, 'the equal protection of the law,' in violation of Artcle XIV of Amendments of the Constitution of the United States.

"7. Because said act withholds from the electors knowledge of the candidates for office, and knowledge of the contents of the official ballot mentioned therein, in violation of the rights of the electors to acquire information as to, and discuss the character of, public men and public measures, a right inherent in the nature and constitution of the government of Virginia.

"8. Because said act violates the freedom of elections and is otherwise in conflict with Article I, Section 8, of the Constitution of Virginia.

"9. Because said act, so far as by Section 12 thereof, it purports to authorize the judges of election by verbal warrant to cause persons to be instantly arrested and imprisoned not exceeding ten days without a trial for certain supposed offences specified therein, deprives such persons of liberty 'without due process of law,' in violation of Article XIV, Section 1, of Amendments of the Constitution of the United States, and of Article I, Section 10, of the Constitution of Virginia.

"10. Because said act, by.divers provisions, and especially by the provisions contained in Section 12 thereof, purports to make and create of actions by the citizens, which are themselves harmless, patriotic, and, it may be, necessary for the preservation of free institutions, crimes and misdemeanors, and is therefore tyrannical and repugnant to the inherent rights of Virginia citizenship, and is in violation of Article I,

Section 21, of the Constitution of Virginia, and of Article IX and Article X of the Amendments of the Constitution of the United States; and

. "11. Because said act is in violation of other constitutional rights of the citizens, taxpayers and electors, not specially mentioned herein."

Accompanying the petition is a brief filed by counsel for petitioners, in which the many interesting questions of law arising upon the record are thoroughly discussed. We feel, therefore, that upon the part of the petitioners, at least, we are in possession of all the means of information which would be accessible to us were the appeal allowed and the case set down for argument. We feel, too, that the questions presented are of the utmost interest to every citizen of the State. We are upon the eve of an election in which many important offices are to be filled, and it is much to be desired that all uncertainty as to the law under which these elections are to be conducted should be removed, and it is therefore a matter of congratulation that the plaintiffs have, in presenting their case to us, thrown sufficient light upon it to enable us to dispose of it without delay and with entire confidence.

Our conception of the law and the duties imposed by it upon the various instrumentalities which it creates will be better understood if presented as a whole, than by the discussion of its separate and independent features.

It will not be disputed—

*First,* That the right of suffrage is derived from the Constitution of the State, and to it we look for the qualification of voters and the limitations and restrictions upon the right of voting; in other words, to ascertain who may, or may not, vote.

*Second,* That the legislature cannot prescribe any qualification in addition to those found in the Constitution, and any attempt to do so openly or covertly, directly or indirectly, is void.

*Third,* That there is no educational qualification prescribed by our Constitution, and a person otherwise qualified to vote, no matter how ignorant he may be, is entitled to vote.

*Fourth,* That the sole function of the legislature, with respect to the exercise of the right of suffrage, is to provide the mode in which those entitled to vote may do so and have their votes counted, and to guard against improper, illegal or fraudulent voting.

*Fifth,* That to this end the legislature may adopt and enforce reasonable rules and regulations to secure the one and prevent the other.

*Sixth,* But, if, under cover of a law to regulate voting, a provision is introduced into the law, which virtually establishes a test of the qualification of the voter, additional to those prescribed in the Constitution, such provision of the law transcends the power of the legislature and is null and void.

Applying these propositions to the law under consideration, we find that the general scheme of the law is to secure the independence of the voter by secluding him within an isolated booth, surrounded by a neutral zone, within which none may enter save those charged with conducting the election. No one is allowed within forty feet of the ballot-box, save the officers charged with such duties, and, in case of a challenge of a voter, the challengers and challenged and the witnesses, all of whom may appear before the judges; when the challenge shall have been decided, only the elector is permitted to remain. The object is to relieve the voter from every influence inimical to a free and deliberate exercise of the right of suffrage, to free him from all solicitation and annoyance, and to leave him a perfectly free agent to vote as to him seems best. These provisions seem to be not only reasonable, but well adapted to secure the end in view, so far as the voter is concerned who is able to prepare his own ballot. He goes to the judges, he receives an official ballot printed by authority

of the State, upon which is to be found every office to be filled and every candidate for that office, whose name has been filed in accordance with the requirement of the law, and he retires to a booth where he is curtained off and secluded from all the world.    No eye can see him and no ear can hear him; no evil agency can approach him; and, with these environments, he prepares his ballot, folds and delivers it to the judge, who, in his presence, places it in the ballot-box.

With the ignorant voter, however, the case is different.    It is obvious that one who, either from physical or intellectual blindness, is unable to read, is wholly incapable of voting by ballot without assistance from some quarter.    The law recognizes this and seeks to provide for it.    The Electoral Board of the county is, by the fifteenth section, required to appoint a special constable, "who shall be an honest and discreet person of said precinct and be able to read and write, and who shall be a conservator of the peace, and shall be especially charged with enforcing the provisions of this act, having all the powers of a constable."    He is required to take an oath faithfully to perfom his duties, and for a corrupt violation thereof is punishable by a fine of not less than $500 and imprisonment for not less than one, nor more than twelve months, in jail.    The act provides, in the fifteenth section, that "at the request of any elector in the voting booth, who may be physically or educationally unable to vote, the said special constable may render him assistance by reading the names and offices on the ballot, and pointing out to him the name or names he may wish to strike out, or otherwise aid him in preparing his ballot.    In case said elector be blind, said special constable shall prepare said ballot for said elector in accordance with the instructions of said elector."

There is much in the petition for appeal, and in the argument presented with it, in which we cannot concur, while there is much we heartily approve and commend.

Opinion.

It cannot be denied that very great power is placed in the hands of this special constable; that a great trust is reposed in him, and that wherever confidence is given it is liable to be abused. We do not think, however, that all the elaborate provisions of the act in question are but artful expedients contrived for the purpose of deluding, entrapping, and defrauding the ignorant voters of this Commonwealth.

The Electoral Boards of the county are chosen by the direct vote of the legislature upon joint ballot, just as are the judges and many other important officers of the State. They, in turn, select the officers charged with the registration of voters and the conduct of elections. Among the latter, as we have seen, are the special constables. They are bound by their oaths of office to select none but good and discreet men, and those men are, in turn, sworn faithfully to discharge the delicate and responsible duties committed to them. Not only do they come under the sanction of an oath, but severe penalties are denounced against them for a violation of their duties; and, in addition to the liability incurred by the express terms of the act, they would doubtless be responsible for damages to any elector with respect to whom they had failed in the performance of their duty.

Let us examine somewhat more in detail the duties of [such] a constable. He is an officer charged with the duty to the public of the gravest and most delicate nature, a duty in performance of which the Commonwealth, and not alone the individual voter, who seeks his assistance in the preparation of his ballot, is vitally interested; for nothing more nearly concerns the Commonwealth than that each of her citizens shall cast an intelligent ballot, which, when cast, shall be honestly counted. Under such circumstances, we may declare with confidence that the word "may," as used in the fifteenth section of this statute, is always construed as mandatory, and not as merely permissive or directory. Without doubt the

primary meaning of "may" is permissive or directory, while the primary meaning of "shall" is mandatory or imperative; yet courts, in order to accomplish what to them appears to be the leading purpose of the legislature, have never hesitated in a proper case to hold "may" to be mandatory and "shall" to be merely directory. These rules of construction are too elementary and well established to need any citation of authority in support of them. Nothing is better established than that where a power or duty is conferred upon an official by the use of the word "may," and the public are concerned in the due performance of that duty, the word "may" will be deemed to be mandatory, and the officer can be compelled to perform it. Such being the case, it is the duty of the special constable to render to him who is blind, or unable by defective education to read, every assistance asked for and required by the elector to aid him in preparing his ballot.

The vote by ballot *ex vi termini* implies a secret ballot. The secrecy of the ballot is a right which inheres in the voter and of which he cannot against his will be lawfully deprived. It must be, however, in some degree subordinate to the right to vote by ballot, of which it is but a part; and the main object, which is the right to vote, must not be defeated by a too rigid observance of the incidental right, which is that of secrecy. A blind man, or a man unable to read, must, in the nature of things, so far compromise the secrecy of his ballot as to invoke and obtain the aid of others in the preparation of his ballot; but as it would be a violation of confidence, were he to seek of a friend assistance on such an occasion, for that friend to betray the secret and disclose the vote, so it is a violation not only of confidence but of official duty for the constable to lift the vail of the secrecy which should be impenetrable, and violate the confidence which the law requires the voter to repose in him. The oath of office of the constable binds him to the performance of the duties imposed upon him,

not only by statute, but by the Constitution. He must observe and respect all the rights of the voter; and among those rights not the least important is to have the secrecy of his ballot kept inviolate, and for a breach of this duty upon the part of the constable he will become amenable to all the pains and penalties provided by law.

There are objections taken which seem to have nothing to rest upon; as, for instance, that which refers to the limitation upon the eligibility to office, and that which charges an invasion of the freedom of the press and of the freedom of speech. These objections and others of a like nature seem to us to be wholly fanciful; or, if in any respect such provisions of the act trench upon and diminish the constitutional rights of the citizen, they are unnecessary to the main purpose of the act, and are separable from it. They could be suppressed and yet leave the law in other respects in full force and vigor. To the latter class of objections belongs the ninth assignment of error, directed to that feature of the law which authorizes the judges of election to arrest and imprison, upon verbal warrants—as to the constitutionality of which we express no opinion. It might have been omitted from the law without at all impairing its efficiency. The offences for which the judges of election are authorized by the clause in question to arrest by verbal warrant, are the "taking of an official ballot beyond the voting booth, or away from said booth, except to the judges of election, or to vote any ballot except such as shall be secured by the elector from the judges of election." These are made misdemeanors, punishable by a fine of one hundred dollars, and, of course, render the person guilty thereof liable to arrest upon proper warrant, which would be equally as efficacious as the more summary remedy given by the statute, should that mode be held void on account of repugnancy to the Constitution.

Since the original petition was filed, counsel for petitioners

have, in what may be termed a supplemental brief, suggested
that the law is further obnoxious to the objection that it
"affords facilities for the absolute destruction of popular elec-
tions," because it allows but two minutes and a half in each
booth to the voter, when by reason of the great number of
names which may be printed upon a ballot, especially in local
elections, it would be impossible for the voter to prepare the
ballot within the limit prescribed. In the same note it is
pointed out that the number of candidates might be intention-
ally multiplied, with a view to embarrassing and hindering
the polling of the vote by "swelling the list of the names of
candidates to such proportions as to make the law disfranchise
the people."

If we were permitted to indulge in conjecture, it would be
easy to conjure up a hypothetical state of facts which would
embarrass, indeed, prevent, the execution of any and all laws.
It would seem, however, that in this case the objections are
inconsistent with each other. In the same breath it is asserted
that the law limits the eligibility to office, and that the rights
of the citizen are in danger of being smothered by the swarm
of candidates. It can hardly be said that the peril from either
direction is so imminent as to require us to pronounce the
election laws of this State unconstitutional. The law places
no limit on the number of election booths that may be sup-
plied, while the power of the County Courts to multiply voting
precincts is fully commensurate with the necessities of the
people, and this court cannot, as a proposition of law, decide
that the time allowed by the statute is inadequate. A limit
was obviously necessary, and the period is, we presume,
arrived at as a result of the careful estimate based upon ex-
perience in this or perhaps in other States where similar legis-
lation has been introduced. The time given was doubtless
deemed sufficient to obviate the necessity for undue haste upon

the one hand, and to prevent the resort to merely obstructive methods of delay upon the other.

The questions of real interest are those with respect to the powers and duties of the special constable, and as to that feature of the law which is supposed to invade the secrecy of the ballot. To them we have given our best consideration, and our views have been presented in what we have already said. It is not, with courts, a question of the adaptation of means to an end. With consideration of policy and expediency courts have no concern. Whether or not the rules and regulations, the checks and safeguards, with which the legislature has seen fit to surround the exercise of the right of suffrage, in order to secure a full, free, and untrammeled expression of the will of the voter are the best that could be devised, is not for us to determine. Such arguments must be addressed to the law-making power. With us it is wholly a question of legislative power, and not one of legislative discretion. By this standard it is impossible for us to say that the act in question is unconstitutional. It cannot be doubted that it was the purpose of the legislature to frame a law which would promote fair elections. It may be that experience may develop unexpected defects in the agencies employed which will call for legislative correction. If such is the case, the remedy will, no doubt, in due time be applied.

The people are with us the source of all honor and power. Their will is expressed by elections by ballot. It is for them to see to it that the agencies employed to collect their will are kept free from all taint of fraud and corruption, and, as far as may be, from the suspicion of it. It is idle to hope for honest officials and honest government as the result of dishonest elections. It would be as well to expect an "evil tree to bring forth good fruit." If fraud is permitted in elections, or if the laws under which elections are held do not make its perpetration both difficult and dangerous, honest men will be

Opinion.

excluded from all participation in affairs, while those who have, by corrupt practices, come into power, will not be slow amply to indemnify themselves, by peculation, for all that their success may have cost. The legislature, therefore, has done well to shelter and protect the voter, and especially the ignorant voter, from every influence inimical to the free exercise of the trust which the State has reposed in him; and we may be permitted to indulge the hope that it will, in the light of experience, supply whatever may be lacking in the existing laws to the accomplishment of that result.

If, however, we had come to a differect conclusion as to the constitutional questions involved in the record, which accompanies the petition in this case, we should still be obliged to refuse the appeal asked for, as the plaintiffs had a plain and adequate remedy at law, under section 836 of the Code of Virginia, without resorting to a bill in chancery.

For the foregoing reasons, we deny the appeal asked for by the petitioners.

APPEAL REFUSED.