𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## BOARD OF SUPERVISORS OF BOTETOURT COUNTY V. CAHOON AND OTHERS.

### November 15, 1917.

1. STATUTES—*Construction—Mandatory or Permissive.*—There are many cases where "may" has been construed to mean "shall," and where a permit, in other language, has been construed into a command. There may be a duty coupled with the power, and where this is true usually the power must be exercised though conferred in merely permissive language. Permissive words are often construed as mandatory where the public interest and rights are concerned, and where the public or third persons have a claim *de jure* that the powers conferred shall be exercised.

2. STATUTES — *Construction — Mandatory or Permissive — Case at Bar.*—The title of an act was, "An act to authorize the board of supervisors of Botetourt county to borrow $90,000, or so much thereof as may be necessary," etc., and by the enacting clause the board was *authorized and empowered* to borrow $90,000, or *so much thereof as may be necessary* for the purposes declared. This language is not equivocal, but is plain and unambiguous, and the circumstances of the case do not disclose any duty resting upon the board to exercise the power conferred. They were given a discretion in the matter, which they exercised when they refused to issue the bonds, and the lower court was without jurisdiction to set aside or annul their action.

Error to a judgment of the Circuit Court of Botetourt county, awarding a mandamus.

*Reversed.*

The opinion states the case.

*Haden & Haden,* for the plaintiffs in error.

*Wm. R. Allen,* for the defendants in error.

BURKS, J., delivered the opinion of the court.

The title of chapter 112, Acts 1916, is as follows: "An act to authorize the board of supervisors of Botetourt county to borrow $90,000, or so much thereof as may be necessary, for the purpose of making permanent improvements in certain public roads and bridges in Fincastle district of said county." The enacting clause of that chapter is as follows: "Be it enacted by the General Assembly of Virginia, that the board of supervisors of Botetourt county be, and they are, hereby authorized and empowered to borrow the sum of ninety thousand dollars, or so much thereof as may be necessary, for the purpose of permanently improving such public roads in Fincastle district as are hereinafter designated, and to issue bonds of said county," etc. Section 1 declares, "the said bonds may be either coupon or registered, as the said board may prescribe; they shall be signed by the chairman of said board of supervisors and countersigned by the clerk thereof; shall be in the denomination of five hundred dollars, or some multiple thereof; shall bear interest at a rate not to exceed five per centum per annum, payable annually on the first day of January, at the office of the treasurer of said county, and shall be payable in thirty years from the date thereof at said office; but thirty-five thousand dollars of said bonds (numbered from one to seventy, consecutively) shall be subject to call after the expiration of ten years from the date of issue and the remaining fifty-five thousand dollars, shall be subject to call after the expiration of twenty years from the said date; but no bonds issued under this act shall be sold for less than their par value." Section 2 declares that the "ninety thousand dol-

97

lars shall be distributed for work upon the following roads.'' Then follows a description of roads and the amount appropriated to each, stating in each instance whether the road is simply to be graded, or graded and macadamized. In several instances the location of the road is left to the discretion of the supervisors. This section closes with the following paragraph: "The foregoing amounts are specified for the purpose of showing how much of said money may be used and on what roads, but should the amount specified for any particular road be in excess of the amount required for such road, then the surplus thereof shall be used for the grading of and work on that road, if any, for which an inadequate amount has been specified, the sum total of this bond issue to be finally determined by estimate furnished by a competent engineer, but the aggregate is not to exceed in any event the sum of ninety thousand dollars. Section 3 declares: "The said board of supervisors shall, when this act takes effect, issue as provided above and deliver said bonds to the treasurer of said county," who is to deliver them to the purchaser upon payment of the purchase price. The section makes the treasurer and his sureties liable for the amount received, and fixes the treasurer's compensation. Section 4 provides for a levy on the property in the district of a sufficient sum to pay the interest and create a sinking fund. Section 5 is in the following words: "The needs of the said district requiring the immediate issue of said bonds, an emergency is declared to exist for this act, and the same shall be in force from its passage."

We have given thus fully the contents of the act, and largely its language, because greatly relied upon by counsel for the appellees to show the mandatory character of the act.

Shortly after this statute was enacted, the board of supervisors applied to the State Highway Commission to make estimates of the cost of the work contemplated by the act so that the board might carry out its provisions. The estimates were made and furnished to the board, but it appearing to the board that no one of the roads could be improved in the manner provided by the act for the sum allotted for the purpose, and that the aggregate cost of the improvements contemplated by the act far exceeded ninety thousand dollars, the board of supervisors declined to issue the bonds or to enter upon the improvements contemplated by the act.

A number of citizens of the district, feeling aggrieved by this action of the board, applied to the Circuit Court of Botetourt county for a writ of mandamus to compel the board to issue said bonds and otherwise carry out the provisions of said act of assembly. Petitioners insist "that the issuing of said bonds by the said board of supervisors is shown by the said act to be purely of a ministerial character, is imperative in its nature, and about which the said board of supervisors had no discretion whatever." The answer of the supervisors insisted that the powers vested in them were discretionary, and that the court was without power to control their discretion. In support of their contention, and also to show the wisdom of their action, the board offered evidence which was not disputed, as follows:

"These estimates showed that the ninety thousand of bonds provided for in the act, as distributed by the said act, would not be sufficient to complete any of the roads mentioned in the act. The act allowed $22,000.00 on road from Eagle Rock to Craig county line, and the estimates on this road were $41,000.00 including bridges, and $36,000.00 not including bridges. The act allowed for grading

and macadamizing road from Eagle Rock to Alleghany county line the sum of $30,000.00, and this amount would have graded the road, and macadamized only two or three miles, while the road was about 14 miles long. The amount of $18,000.00 was allowed to be spent on the macadam road from Eagle Rock to Fincastle, which is now being constructed, and the amount would not have completed this rock road, leaving two or three miles not macadamized. The amount allowed by the said act on each of the other roads mentioned in the said act was likewise insufficient to complete them.

"The board, therefore, deemed it inexpedient to issue the $90,000.00 of bonds. The board doubted that a majority of the qualified voters of Fincastle district wanted the said bonds issued, and after the estimates showed that the cost was greater than the amount allowed in the act, the said board doubted the wisdom of issuing the bonds, and the said board offered to hold an election on the subject, which election would necessarily have been held under the general law, on estimates furnished by the State Highway Commission, and the work done according to its specifications, but it has been my idea and understanding of the law that the work would have to be done according to the specifications of the State Highway Commission, whether the bonds were issued under the special act, or issued in pursuance of an election.

"The advocates of the bond issue under the special act said they doubted if an election under the general law would carry, and they were, therefore, opposed to an election. No election was then ordered, and the board declined, for the reasons above stated, to issue the bonds under the said special act, and the board construing the said act to be permissive and not mandatory."

The circuit court, however, entered an order requiring

the supervisors "immediately upon receipt of this writ and without delay to borrow the said sum of ninety thousand dollars, or so much thereof as may be necessary, for the purpose of permanently improving such public roads in Fincastle district of said county as are designated in the said act, and to issue the bonds of the county of Botetourt therefor as set out and provided in chapter 112 of the Acts of the General Assembly of Virginia, session of 1916, approved March fourth, 1916, and generally to do and perform all such acts as are necessary to carry out the provisions of said act." To this order and judgment of the circuit court this writ of error was awarded.

The sole question presented for our consideration is: Is chapter 112 of Acts of 1916 mandatory on the board of supervisors of Botetourt county, or not?

The title of the act is, "An act to authorize the board of supervisors of Botetourt county to borrow $90,000, or so much thereof as may be necessary," etc., and by the enacting clause the board is *authorized and empowered to* borrow $90,000, or *so much thereof as may be necessary,* for the purposes declared. These are permissive words, conferring a power that did not otherwise exist, and *prima facie* at least appear to invest the board with a discretion which it could exercise or not as its judgment dictated. But the character of a power thus conferred is not to be determined solely by the language of the act conferring the power. There are many cases where "may" has been construed to mean "shall," and where a permit, in other language, has been construed into a command. There may be a duty coupled with the power, and where this is true usually the power must be exercised though conferred in merely permissive language. There are many cases illustrating this principle, though the language of the courts has not been uniform in its expression.

In *Supervisors* v. *United States,* 4 Wall 435, 18 L. Ed. 419, an act of the Illinois legislature was entitled, "An act to enable counties owing debts to liquidate same," and in the body of the act it was declared that, "The board of supervisors \* \* \* in such counties as may be owing debts which their current revenue under existing laws is not sufficient to pay, may, if deemed advisable, levy a special tax \* \* \* to be expended \* \* \* in liquidation of such indebtedness." The relator in that case had recovered a *judgment* against the county upon past due coupons for a debt owing by the county. The Supreme Court of the United States held the language of the statute to be peremptory, and not merely permissive. Mr. Justice Swayne, in delivering the unanimous opinion of the court uses this language: "The conclusion to be deduced from the authorities is that where power is given to public officers, in the language of the act before us, or in equivalent language, whenever the public interest, or individual rights call for its exercise, the language used, though permissive in form, is in fact peremptory. What they are empowered to do for a third person the law requires shall be done. The power is given, not for their benefit, but for his. It is placed with the depository to meet the demands of public right and prevent a failure of justice. It is given as a remedy to those entitled to invoke its aid and who would otherwise be remediless." The report of this case gives a good collection of cases on both sides of the question under consideration.

In *City of Galena* v. *Amy,* 5 Wall. 705, 18 L. Ed. 560 where an act amending a city charter said that the council "may if it believe that the public best interests of the city require it," levy a tax to pay its *funded debt,* it was held that a mandamus would lie at the suit of a judgment creditor to make it levy the tax. In other words, that the language

was to be construed as mandatory. The court said, amongst other things: "This power (conferred by the section above quoted) has not been exercised by the city authorities, and they have made no other provision for liquidating the debts due the relator. They have no other means of payment, in possession or in prospect. * * *

"The rights of the creditor and the ends of justice demand that it should be exercised in favor of affirmative action, and the law requires it. In such cases the power is in the nature of a trust for his benefit, and it was the plain duty of the court below to give him the remedy for which he asked. * * * These principles were fully considered in *Supervisors* v. *United States,* 4 Wall. 435 [18 L. Ed. 419] * * * and it is sufficient to refer to that case for a fuller exposition of our view upon the subject."

In *People* v. *Commissioners of Highways,* 130 Ill. 406, 22 N. E. 833, 6 L. R. A. 161, some one had built *a fence across a public highway* which diverted the travel over the land of an adjacent owner, who applied for a mandamus to compel the commissioners to remove the obstruction. The court in construing section 71 of the Illinois statute, said: "The language of section 71 is 'that the commissioners after having given reasonable notice * * * may remove any such fence or obstruction.' We think it was intended by the statute to impose upon the commissioners the imperative duty of removing obstructions from the public highway, and that the word 'may' is to be construed as 'shall.' The word 'may' in a statute will be construed to mean 'shall' whenever the rights of the public or third persons depend upon the exercise of the power, or the performance of the duty to which it refers; and such is its meaning in all cases where the public interests are concerned, or a public duty is imposed upon public officers, and the public or third persons have a claim *de jure* that the power shall be exercised."

In *People* v. *Board of Supervisors*, 51 N. Y. 401, the title of the act under consideration was, "An act providing for relief against illegal taxation." The language of the first section of the act provided that the board of supervisors of the several counties mentioned, "are authorized and empowered, upon the application of any party aggrieved, to hear and determine any claim of assessment of taxes made in their respective counties upon United States bonds, stocks, or other securities, which by law are or have been exempted from taxation, and to repay to the proper person the amount collected or paid upon such assessment." The act further provided that whenever such claim was audited and allowed the supervisors should levy the amount thereof upon the taxable property of the county. A bank which had *paid taxes* on such securities several years before had applied to the supervisors to have the taxes so paid audited, allowed and refunded as provided in the act, but the supervisors refused to audit the claim or to direct its payment, claiming that the act under which the refund was demanded was merely permissive, but the Supreme Court awarded a writ of mandamus directing the supervisors without delay to determine, audit, and allow the claim, and to levy the amount thereof by tax as required by said act. The Court of Appeals of New York, in its opinion, said: "The first question to be determined is whether the act was merely permissive or mandatory to the boards of supervisors. To determine this question, not only the language of the act, but the circumstances surrounding its passage and the object it had in view, must be considered. The highest judicial authority in the land had decided that these taxes were illegally exacted. The relator, therefore, had a claim, based upon natural justice and equity, that the taxes should be refunded, and as there was no way to compel the counties to refund them, the act was passed. The title of the act shows that it was to provide against illegal taxation.

The relief would be quite illusory if it were left to the absolute discretion of the board of supervisors of any county to refund the taxes or not, as it might see fit. The act recognizes the party who has paid the taxes as an aggrieved party, who has a claim against the county which is to be audited and allowed like other claims against the county. It is not to be presumed that the legislature intended that the counties and towns which had the benefit of this illegal taxation should have the option, through their supervisors, to determine whether they would do justice to the wronged taxpayer by refunding the taxes illegally exacted, or not. The purpose of the act, as well as the simplest justice, requires that we should hold that it is mandatory upon the respective boards of supervisors, unless there is something in the plain language used that forbids such a construction."

In *People* v. *Board of Supervisors,* 68 N. Y. 115, the court had under consideration an act entitled, "An act for the relief" of Conway and others, and the first section of the act provided that the "board of supervisors * * * is authorized to adjust and audit the claims" of Conway and others, and the second section provided that "the said board may cause to be levied and collected such sums, etc." It seems that Conway had built a bridge connecting two towns under contract with the commissioners of highways of the two towns. The towns refused to pay the contract price, and it was held that as they were not bound to build or repair the bridge they were not liable upon the contract, and the county was held not liable because not a party to the contract and had not ordered the construction of the bridge. Under these circumstances the act above mentioned was passed by the legislature. In holding the county bound to audit and pay the claims of Conway and others, the court said: "Where it is merely indifferent whether a thing shall be done or not, then the word 'may' in an act is usually con-

strued to confer a permissive authority; but where the public interest or private right requires that the thing should be done, then the word 'may' is generally construed to mean the same as 'shall.' In such a case it must be presumed that it was the legislative intent to confer the authority for the purpose of promoting the public interest or securing the private right. In this case the legislature, knowing that Conway had built a bridge over a public highway * * * cannot be supposed to have left it discretionary with the representatives of the public whether they would pay him or not."

Many other cases might be cited to the same effect. Probably as clear a statement of the law as can be found is that given by Lord Cairns in *Julius* v. *Bishop of Oxford,* L. R. 5 App. Cas. 214. Construing the meaning of the phrase, "it shall be lawful," his lordship said: "The question has been argued, and has been spoken of by some of the learned judges of the courts below, as if the words 'it shall be lawful' might have a different meaning and might be differently interpreted in different statutes or in different parts of the same statute. I cannot think that this is correct. The words 'it shall be lawful' are not equivocal: they are plain and unambiguous. They are words merely making that legal and possible which there would otherwise be no right and authority to do. They confer a faculty or power, and they do not of themselves do more than confer a faculty or power. But there may be something in the nature of the thing empowered to be done, something in the object for which it is to be done, something in the conditions under which it is to be done, something in the title of the person or persons for whose benefit the power is to be exercised, which may couple the power with a duty, and make it the duty of the person in whom the power is reposed to exercise that power when called upon to do so. Whether the power is one coupled with a duty such as I have described, is a

question which, according to our system of law, and speaking generally, it falls to the Court of Queen's Bench to decide on an application for a mandamus."

Our own decisions are to the same effect. In *Bean* v. *Simmons*, 9 Gratt. (50 Va.) 389, 391, the court in construing the language, "may be allowed to file an answer," said, "the general rule in the construction of statutes is that the term 'may,' when used in a statute, means 'must' or 'shall' in cases where the public interest and rights are concerned, and where the public or third persons have a claim *de jure* that the powers shall be exercised." To the same effect, see *Radford* v. *Fowlkes*, 85 Va. 820, 828, 8 S. E. 817, and cases cited. In *Lee* v. *Mutual Life Ass'n.*, 97 Va. 160, 33 S. E. 556, in construing an act of assembly which declared that the court 'may' order an action or suit to abate as to any party improperly joined, and proceed to judgment as to the others, it was held that "may" meant "shall;" and in *Pearson* v. *Supervisors*, 91 Va. 332, 21 S. E. 483, where the statute provided that, "at the request of any elector in the voting booth who may be physically or educationally unable to vote, the said special constable may render him assistance by reading the names and offices on the ballot and pointing out to him the name or names he may wish to strike out, or otherwise aid him in preparing his ballot," it was held that "may render him assistance," was mandatory and not merely permissive. But in all these cases the third person had a claim *de jure* to have the power exercised in his favor.

It remains, therefore, to be considered whether in the instant case the power conferred upon the board of supervisors is coupled with the duty which renders the language of the statute mandatory.

It has been earnestly contended before us that the many mandatory provisions of the act, which have been hereinbefore set forth, indicate the intention of the legislature to make mandatory the provision of the enacting clause by

which the board is *"authorized and empowered"* to borrow the money, but a careful reading of the act discloses that every mandatory provision of the act is hypothecated upon the assumption that bonds *have been issued,* and the fact that the act abounds in such provisions throws no light upon the question of whether the provision for their issuance is mandatory or discretionary. This question is to be answered from other considerations.

The words "authorized and empowered" are not equivocal; they are plain and unambiguous. Is there, then, anything in the nature of the thing "authorized and empowered," anything in the object for which it is to be done, which makes it the duty of the supervisors to issue the bonds when called upon to do so? If not, the words must be construed according to their plain and ordinary meaning. There is no debt owing, for the payment of which the county ought to provide. There is no obligation resting upon the county which the *ends of justice* demand should be discharged. There is no trust imposed for the protection of the health, morals, safety or welfare of the community. No obligation is imposed upon the board to right a wrong that has been done, or to correct an injustice of any kind. The act imposes no obligation upon the board to keep the public highways open and in a reasonably safe condition for public travel, but "authorizes and empowers" the board to borrow money for the *permanent improvement* of certain highways in the county. The object of the act is not to discharge an existing obligation, but to authorize the board to inaugurate a permanent improvement, and thereby impose a large liability. The expediency of doing the act authorized, in the manner authorized by the act, is a matter concerning which there is serious difference of opinion. Where this is the case, it cannot be said that the power is coupled with a duty, and words of permission will not be construed into commands.

Whether or not the county roads shall be permanently improved, and, if so, whether the improvement shall be made gradually by direct taxation, together with State aid, or by bond issues, either for the whole county or for certain districts thereof, are questions of grave importance upon which there has been no unanimity of opinion. Some of the counties have adopted one plan, others another. In order to meet the situation, the legislature has by general laws, made provision for giving aid by the State under conditions, and to the extent provided by law, and for issuing bonds of the county when desired. (Acts 1908, p. 90: Acts 1916, p. 461). No bonds, however, can be issued under the general law until after an election has been held on the subject, and it has been ascertained, as the result of such election, that it is the desire of the qualified voters of the district or county that they shall be issued. The matter is left entirely in the hands of the local communities. No instance of a departure from this policy of leaving to the local communities the decision of whether or not bonds shall be issued for road improvements has been brought to our attention, nor do we know of any, and yet if the contention of the defendants in error be upheld, the legislature has taken from the people of Botetourt county, and from the Fincastle district in said county, all choice in the matter, and compelled the supervisors of the county to issue bonds of the county to the amount of ninety thousand dollars for the improvements mentioned in the act, although no one of the roads mentioned in the act can be improved in the manner therein provided, for the sum set apart for that purpose. Furthermore, it is a matter of common knowledge that, as a result of the great war in which we are engaged, there has been a great increase in the price of labor and of all the materials that enter into road construction since those estimates were made by the State Highway Commission, so that funds which were inadequate when the estimates

were made are far more so now than they were then.   No option is given the supervisors to change the apportionment of the funds, nor to omit any one of the roads from the apportionment.   It is sought to place the supervisors in the anomalous position of being compelled to make *designated* improvements for a sum of money far inadequate to accomplish the result required.   Such would be the result of the contention of the defendants in error as to the proper construction of the act in question.   We are unable to concur in this contention.   The language of the act, "the board of supervisors * * * are hereby authorized and empowered" is not equivocal, but is plain and unambiguous, and the circumstances of the case do not disclose any duty resting upon the board to exercise the power conferred. They were given a discretion in the matter, which they exercised when they refused to issue the bonds, and the circuit court was without jurisdiction to set aside or annul their action.   For these reasons the judgment of the circuit court must be reversed.

*Reversed.*