THE COMMON COUNCIL OF THE CITY OF DETROIT v. PETER RUSH, CONTROLLER.

*Constitutional law—Election law of 1889.*

1. Act No. 263, Laws of 1889, entitled "An act to prescribe the manner of conducting, and to prevent fraud and deception at, *general* elections in this State," is constitutional, and is construed as follows:

    *a*—The provisions of the act do not apply to municipalities whose elections are governed by special enactment, except in so far as they relate to the ballot and booths to be used, as provided in sections 8, 9, 10, 11, 20, and 21 of the act.

    *b*—Under the act a blind voter, or one who cannot read, or who is a cripple and cannot walk, is entitled to receive assistance in the preparation of his ticket, and to receive and have it prepared outside of the polling place, and to be assisted to a booth or the polls if physically unable to go alone.

    *c*—Should a voter desire to write his ballot, the act furnishes ample provisions for him to do so, and have it counted. He may erase any or all of the names upon any ticket, and write in any names he may choose. If he has no political affiliations, he may erase the heading of any ticket, and write a heading of his own choosing.

    *d*—It is of no consequence that expense must be incurred, and that the statute is silent upon the question of payment. Whenever an active duty is imposed upon municipalities, or public officers representing municipalities, the duty imposed carries with it the obligation on the part of the municipality to perform the act, bear the expense, and provide for its payment.

*e*—It is the clear duty of the Secretary of State to see that the tickets are printed and furnished; of the municipal authorities to provide the booths, and have them ready for use the morning of election; and of the election boards to perform the duties imposed upon them.

2. We might with propriety decline to discuss the case further, as all else that we may say must relate to the *methods* to be employed in carrying the law into effect. But inasmuch as uniformity in the conduct of elections is so essential, we will express our views on certain features of the law in this respect:

*a*—The booths must be so constructed as to secure secrecy to the voter in the *preparation* of his vote, but so as not to obstruct the view between the public and the voter when he *deposits* his vote.

*b*—The gate-keeper must admit within the railing at one time as many voters as there are booths, and no more, and as fast as one booth becomes vacant he must admit another voter.

*c*—The booths must be so constructed that the voter will be obliged to pass *through* a booth to the polling place. The statute evidently contemplates an entrance and an exit gate, which should be placed as far apart as convenience will permit, and each should be supplied with a keeper, and the keeper of the exit gate must be stationed outside of the railing.

*d*—The duty of the Secretary of State ends with the printing of the tickets, and their delivery to the proper committees of the different political parties, he not being required to deliver tickets to the inspectors of election.

*e*—We do not wish to be understood as holding that no ticket can be received or counted unless furnished by the Secretary of State, although the language is very comprehensive that "no ticket shall be used at any such election, or circulated on the day of such election, unless furnished by the Secretary of State."

*f*—These tickets will be furnished by the Secretary of State only upon payment of the cost thereof. The law contains no provision for delivering to that officer an authentic copy of the names of candidates chosen by the political parties, nor is this necessary, as no more difficulty can arise in furnishing such names than has heretofore existed in furnishing them to parties who were to attend to the printing of the tickets. It is fair to presume that the Legislature intended that the same methods should be used in the one case as the other.

*g*—It is immaterial whether a ticket is filed with the county clerk by the Secretary of State or by the proper committees of the political parties, as the law is satisfied if done by either,

although certainty of performance would suggest that it be done by the Secretary of State.

*h*—The printing of the tickets is not to be done at the expense of the State, and the Secretary of State is not bound to have it done at the State printing-office, but may select his own place of printing.

*i*—If political parties having county tickets in the field, but no State ticket, choose to vote only the county ticket, they can prepare their vignette or heading and their tickets, and deposit one with the county clerk, as provided by section ten of the act, and procure their printing to be done by the Secretary of State, and deposit their ballots with the inspectors. If they choose to vote the State ticket of any of the other political parties, they can erase the county ticket, and paste their own in its stead.

*j*—The provision of section 30 authorizing the board of elections to limit the time which a voter may remain in the room or booth while preparing and voting his ballot is applicable to elections in *cities* as well as *towns*, and it is the *imperative* duty of such boards to limit the time as provided in said section.

*Mandamus.* Submitted October 7, 1890. Granted October 14, 1890.

Relator applied for *mandamus* to compel respondent to advertise for bids to construct election booths, under Act No. 263, Laws of 1889. The facts are stated in the opinion.

*B. W. Huston,* Attorney General (*Alfred Russell* and *Don M. Dickinson,* of counsel), for relator.

*C. S. McDonald* and *Edward Minock,* for respondent.

GRANT, J. The common council of the city of Detroit passed a resolution, requiring the respondent to take the necessary action to carry into effect the election law of 1889 (Act No. 263) at the coming election. He refused, alleging as grounds of such refusal:

1. That the act is unconstitutional and void.

2. That the booths and railings will cost a large sum of money, and that no provision has been made by the law for paying the expense.

Petition for *mandamus* is filed to compel action upon the part of respondent.

The act is entitled—

"An act to prescribe the manner of conducting, and to prevent fraud and deception at, general elections in this State."

Its validity is the only question involved. The provisions of the act do not apply to municipalities whose elections are governed by special enactment, except in so far as they relate to the ballot and booths to be used, as provided in sections 8, 9, 10, 11, 20, and 21. These provisions are therefore the only ones in controversy here. They read as follows:

"Sec. 8. At every general or special election held in this State, after the passage of this act, each elector shall vote by ballot, and shall, in full view, deliver to the chairman of the inspectors of election a single ballot or ticket, on which shall be written or printed, or partly written and partly printed, the names of the persons voted for, with proper designation of the office which he or they may be intended to fill. No ballot or ticket shall bear upon the outside thereof any impression, device, color, or thing, designed or liable to distinguish such ballot or ticket from other legal ballots or tickets, whereby the same may be known or designated. No ticket shall be used at any such election, or circulated on the day of such election, unless furnished by the Secretary of State for such purpose; and it is hereby made the duty of the Secretary of State to procure and furnish on application, and payment to him of the actual cost, with ten per cent. added thereto, by the State central committee, county, or other managing committee of any political party or organization in this State, such quantity or amount of ballots to be used at such approaching elections as may be deemed necessary or convenient. All ballots to be of the same width and length.

"Sec. 9. It shall hereafter be the duty of the State central committee, county committee, or other managing committee of any political party or organization in this State, before each election in this State, to prepare and adopt, by engraving or otherwise, a ticket vignette or heading, with an appropriate inscription, to be

printed at the top of the ticket of the party, on the inside thereof, as a distinctive and characteristic heading thereto. Such vignette or heading shall not be more than two inches high by four and one-half inches wide, and, in addition to the device adopted, shall set forth legibly the fact that the ticket is the regular ticket of the party with the name thereof. It shall also show the congressional, senatorial, and representative districts, and county where such ticket may be lawfully voted.

"Sec. 10. When such vignette and inscription shall have been adopted and prepared, an impression of the same, followed by the regular ticket of such party, printed so as to constitute a lawful election ballot, and sealed up in an envelope, shall be filed with the county clerk of the county where such election is to be held, at least ten days before the opening of the polls at such election. Such ballot shall be kept by such clerk on· deposit, and from the time of said filing it shall be unlawful for any person to imitate, copy, or in any manner counterfeit the same. Any person violating the foregoing provision shall, upon conviction thereof, be punished by a fine not exceeding one thousand dollars, or by imprisonment in the State prison for the term not exceeding one year, or both, in the discretion of the court.

"Sec. 11. Any person who shall knowingly print, circulate, distribute, or cause to be distributed, any ticket or tickets, ballot or ballots, having thereon the vignette, or any imitation of the vignette, or inscription of any ballot or ticket so filed with the county clerk, but containing the name or names of any candidate or candidates other or different from the name or names upon the ballot, or ticket of such party so filed or deposited with said clerk, or who shall intentionally destroy or carry away any ballot or ballots, except for his own use in voting, which shall have been furnished by the inspectors of election for such purpose, shall, upon conviction thereof, be punished by a fine not exceeding one thousand dollars, or by imprisonment in the State prison not exceeding one year, or both· such fine and imprisonment at the discretion of the court: *Provided*, That nothing in this act shall be construed to interfere with the right of any elector to erase or insert any name or names upon such ticket, if done in writing, or by printed slips by the elector himself."

"Sec. 20. In all townships containing one hundred or more electors, and in all voting precincts in cities and villages, the township board of each township, and the various officers whose duty it may be to designate and prescribe the place or places of holding general elections in the several cities, wards, election districts, and voting precincts throughout the State, shall, and, in all townships having less than one hundred electors may, provide for, and cause to be erected in the room where elections are to be held, a railing

or fence four feet in height, which railing or fence shall be placed through and across the center of the room, and shall cause a gate to be erected in said railing, and said gate shall be in charge of a gate-keeper appointed at the opening of the polls by the board of inspectors, and no person shall be allowed to be inside of said railing except to vote, and, as soon as the elector has voted, he shall retire without, and shall not again be admitted within, the railing, and only as many electors as there are booths shall be allowed within the railing at one and the same time, and the electors shall be admitted in the order in which they shall apply. The entrance gate shall be erected or placed at one side of the room, and on the inside of the said gate a booth or temporary room shall be erected. At least one such booth shall be provided at each polling place, and not less than one for each hundred persons entitled to vote thereat, and one booth additional for any additional number of voters less than one hundred and more than twenty-five, with walls not less than six feet high, and in such a manner that, as the elector passes in at the gate to the room where the ballots or tickets are taken by the inspectors of election, he shall pass through said booth or temporary room, and be concealed from the view of the inspectors of election and those without the said railing while passing through said booth. Said railing shall also contain an exit gate at a convenient place for voters to pass out.

"SEC. 21. Before the opening of the polls of any election within the provisions of this act, the inspectors of election shall cause to be hung up or deposited within the booth in the polling place, and, in towns where no booths are provided, by placing on a table or desk near the polling place, in separate packages, tickets of all political parties, and pasters or slips for the several candidates, if desired and furnished by them, to be voted at said election, for the use of electors, and the inspectors of election shall cause said tickets to be replaced when used, so that tickets shall be so hung up or on deposit during the entire time that the polls are open."

The Constitution of Michigan contains three provisions upon the subject,—sections 1, 2, and 6 of Article 7.

Section 1 provides who shall be an elector, and that the Legislature may provide the way in which his vote shall be cast.

Section 2 provides that all votes shall be by ballot.

Section 6 provides that laws may be passed to preserve the purity of election, and guard against abuses of the elective franchise.

Under these broad provisions, it has been frequently held to be the exclusive province of the Legislature to enact laws providing for the registration of voters, and

the time, place, and manner of conducting elections. It may regulate, but cannot destroy, the enjoyment of the elective franchise. Whether such regulation be reasonable or unreasonable is for the determination of the Legislature; and not for the courts, so long as such regulation does not become destruction. *Attorney General v. City of Detroit*, 78 Mich. 545. Courts will not declare the law invalid because its enforcement might result in the restriction of the right to vote, else the registry laws would have been held void. Yet these laws have been universally sustained, on the ground of wise and necessary regulation. In 1832, Chief Justice Shaw sustained them, on the ground that they tended to—

"Promote peace, order, and celerity in the conduct of elections, and as such to facilitate and secure this most precious right to those who are by the constitution entitled to enjoy it." *Capen v. Foster*, 12 Pick. 485.

The principles then enunciated have been adopted by this Court in numerous cases. *People v. Blodgett*, 13 Mich. 127; *People v. Kopplekom*, 16 Id. 342; *Attorney General v. Detroit Common Council*, 58 Id. 213 (24 N. W. Rep. 887). When power is conferred upon the Legislature to provide instrumentalities by which certain objects are to be accomplished, the sole right to choose the means accompanies the power, in the absence of any constitutional provisions prescribing the means. The finding by this Court that the law impeded, hampered, or restricted the right to vote, and is therefore void, would be a clear assumption of, and encroachment upon, legislative power, —a substitution of our judgment for that of the Legislature. It can only be declared void when it destroys the right. Its unconstitutionality can be determined by no other rule.

Frauds in elections produced the necessity of the registry laws. But these were not found sufficient to prevent

frauds and abuses, which became so notorious that other means were found necessary to preserve the purity of elections. Fraudulent tickets were issued,—fraudulent in that they purported to be the regular party tickets, but in reality contained the names of some of the candidates of the opposite political party,—and thus voters were deceived into voting for candidates not of their choice, and contrary to their intention. The preparation and distribution of ballots by party agents furnished an excuse for large assessments upon candidates. Voters were supplied with tickets, and accompanied to the polls by party agents to see that the tickets furnished were deposited in the boxes. Votes became the subject of bargain and sale, and the purchaser accompanied the voter to the polls to see that the infamy was consummated by the deposit of the vote placed in his hands. Drunken men were taken to the polls, supported by their fellows. The voting places were overcrowded, and in this way voters were kept from the polls or deterred from voting. "Workers" were employed, and paid by candidates and party managers to peddle tickets; and not always were they employed for their most commendable qualifications, or from the most worthy motives. Secret organizations met on the night previous to election, and furnished their members with "vest-pocket" tickets,—a proceeding foreign to the spirit of our government. Intimidation of voters was openly charged under the system, under which employers could stand in close proximity to the polls, and distinguish what ticket their employés voted. The expenses of an election have become so great as to deter many good men from accepting nominations. Such are some of the abuses that grew up under the old system, rendering a reform absolutely necessary to secure fair and honest elections, good government, and the perpetuity of our institutions. To such an extent have these abuses been

carried that one of the eminent counsel for relator felt justified in asserting in his brief that "fraud in elections has become a fine art and corruption of voters a profession;" and the Governor of the State in his message in January, 1889, made it the subject of earnest and special comment. Senate Journal, 1889, p. 18.

The secrecy of the ballot is the great safeguard to the purity of elections. The vote by ballot implies secrecy. This secrecy should not be confined to the time of depositing the ballot. It should accompany the voter through all the steps provided for the preparation of his ballot. Only in this way can he be freed from all intimidation, improper influences, reproach, and animadversion. When all knowledge of how he voted is the voter's own secret unless he chooses to divulge it, he is fully protected, and a free and honest vote will very uniformly be the result. Stringent laws have been enacted in many of the states upon this subject, and have been universally sustained by the courts so long as the right to vote was preserved to all. In the attempt to remedy the evils and abuses above mentioned, our Legislature enacted the present law. The law must be liberally construed, and all doubts solved in its favor. As was said in *Ogden v. Saunders*, 12 Wheat. 270:

"It is but a decent respect, due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt."

The essential provisions of this law are as follows:

1. All ballots must be of the same width, length, and color.

2. They must bear no marks or devices on the outside whereby they may be known or designated.

3. They must be furnished by the Secretary of State, and no others used or circulated.

4. Booths must be provided, so constructed that voters must enter and pass through them on their way to the polls, and while in them be concealed from the view of all.

5. One voter only is permitted to enter the booth at a time, and he is allowed sufficient time to select and prepare his ballot according to his own free will; having done which, he must then deliver his vote to the chairman of the inspectors, in full view of all present.

6. No one can be allowed inside the railing except the gate-keeper, and the challengers provided by section 17, —one for each political party.

7. The inspectors of election must keep these booths supplied with tickets of all political parties, and pasters or slips of candidates, if requested and furnished by them.

It is objected that the law deprives those who cannot read, the blind, and cripples who cannot walk, of the opportunity and means of voting. If such were the effect, the law would clearly be void, for they are given this right by the Constitution. We are cited to *Rogers v. Jacob*, 11 S. W. Rep. 513, as a case in point. But the statute there under consideration provided that the voter must resort to the booth, and there, "alone and unaided," prepare his ballot. It is contended that under the act in question the result is the same, because no one is permitted to accompany the voter to the booth to assist him. It is to be regretted that the Legislature did not expressly provide for furnishing ballots to this class of voters. We must, therefore, carefully examine the act, to ascertain if it leaves no way for such voters to obtain ballots. It is clear that, if voters are limited to the use of tickets provided in the booths, then some voters are disfranchised by the very terms of the law. But we do not think that the law necessarily bears that construction. There is no express prohibition against assisting such a person in the preparation of his ticket, nor against his obtaining a ticket outside the polling place for that purpose, nor against assisting to a booth or the polls one physically

unable to go alone.    Such a case is not within the mis-
chief aimed at, and we hold' that under this law such a
voter is entitled to receive assistance in the preparation
of his ticket, and to receive and have his ticket prepared
outside the polling places.    This, we think, is in accord
with that maxim of interpretation that a thing which is
within the spirit of a statute is within the statute,
although not within the letter; and a thing within the
letter is not within the statute, unless within the inten-
tion.    *Sisters of Charity v. City of Detroit,* 9 Mich. 98,
and cases there cited.

The voter has not the right guaranteed him by the
Constitution to the exercise of his own fancy or whim in
the kind of paper to be used, or the size of the ticket to
be voted.    Under such a right, he might present a ticket
of such size that it could not be deposited in the box.
By this act he is not deprived of voting for whom he
chooses, nor compelled to vote for any of the regular
party candidates.    Printed ballots are in universal use.
Written ballots are seldom, if ever, used.    But should the
voter desire to write a ballot, this act furnishes ample
provisions for him to do so, and have his ballot counted.
He may erase any or all of the names upon any ticket,
and write in any names he may choose.    If he has no
political affiliations, he may erase the heading of any
ticket, and write a heading of his own choosing.    But the
people have a right to say that all ballots shall be of
uniform color and size, and the voter's rights are not
even abridged or restricted by such requirement.

It is of no consequence that expense must be incurred,
and that the statute is silent upon the question of pay-
ment.    Whenever an active duty is imposed upon munic-
ipalities, or public officers representing municipalities, the
duty imposed carries with it the obligation on the part
of the municipality to perform the act, bear the expense,

and provide for its payment. We find nothing in the above provisions which is unconstitutional, and not within the exclusive province of the Legislature. All of the provisions found in the body of the act are germane to the object expressed in the title. It is apparent to all that, if honestly carried out, they will go far to prevent fraud and corruption, and purify our elections. It is the clear duty of the Secretary of State to see that the tickets are printed and furnished; of the municipal authorities to provide the booths, and have them ready for use on the morning of election; and of the election boards to perform the duties imposed upon them.

Counsel have argued that the provisions of the law are in the main directory, and not mandatory. This is not the proper occasion to discuss that question, nor to determine the effect of any neglect or failure to comply with the law. It is not to be presumed that any of the officers mentioned in the act will neglect to do their duty. We are certainly not called upon now to furnish an excuse for such neglect or failure by a judicial determination of what the effect thereof will be. The proper time for the determination of that question will be when some one claiming to have been damnified by such neglect or failure presents his case in this Court. The parties directly in interest are then entitled to be heard. There will also be more time for investigation and deliberation by the Court than is now afforded, in view of the near approach of the election, and consequent haste in preparing our decision. We therefore decline now to pass upon that question.

It is suggested rather than insisted that the law is inoperative and ineffectual, on the ground that it furnishes no adequate means to secure the purposes for which it was enacted, and is futile without further legislation. The test for the determination of this question is, can the

provisions of the law be carried out by instrumentalities within reach of those intrusted with its execution? It must be clear to every careful and unprejudiced reader of the law that its provisions are not incapable of enforcement. It is not enough that the law does not expressly prescribe the means for carrying its provisions into effect. If men of common sense and reason can devise and provide the means, the law is valid, and the officers must proceed with its enforcement. All the instrumentalities for its proper enforcement exist, and the officers *can* and *must* use them.

We might with propriety decline to discuss the case further, as all else that we might say must relate to the methods to be employed in carrying the law into effect. It is rather unusual for a court to determine beforehand what officers must do under the law. The province of courts usually is to determine the validity of their acts after they have been preformed. But inasmuch as all the attorneys in the case, particularly the distinguished counsel representing the two great political parties of the State, have requested such action on the part of the Court, and inasmuch as uniformity in the conduct of elections is so essential, we will express our views on certain features of the law in this respect. It is undoubtedly true that the law is defective in several particulars, and needs amendment, but the difficulties in the way of carrying out its provisions are more imaginary than real.

1. The booths must be so constructed as to secure secrecy to the voter in the preparation of his vote, but so as not to obstruct the view between the public and the voter when he deposits his vote. This is apparent for two reasons:

1. Because the law expressly provides that the voter shall deposit his ballot while in full view.
2. Because any elector has the right of challenge.

The gate-keeper must admit within the railing at one time as many voters as there are booths, and no more. As fast as one booth becomes vacant, he must admit another voter. They must also be so constructed that the voter will be obliged to pass through a booth to the polling place. The statute evidently contemplates an entrance and an exit gate. These are necessary to secure orderly conduct and rapidity in the admission of voters. They should be placed as far apart as convenience will permit, and each should be supplied with a keeper. The keeper of the exit gate must be stationed outside the railing. The provisions for the booths are so plain that further statement is unnecessary.

2. The duty of the Secretary of State ends with the printing of the tickets, and the delivery of them to the proper committees of the different political parties. The law does not require him to deliver any to the inspectors of election. This act recognizes the fact that this duty of furnishing tickets at the polls has heretofore been performed by the agencies of the different political parties, and assumes that the same instrumentality will secure the delivery of the ballots to the inspectors of election. No other means are provided by the act, and, until the law is amended, this is the only course that can be pursued. We do not wish to be understood as holding that no ticket can be received or counted unless furnished by the Secretary of State, although the language is very comprehensive that "no ticket shall be used at any such election, or circulated on the day of such election, unless furnished by the Secretary of State." If a sufficient quantity of tickets are supplied at the booths, there would be little occasion for the question to arise. There would then be no object in printing a ticket, unless it were a bogus one, the printing or use of which is criminal, and punishable by a heavy fine and imprisonment.

82 MICH.—35.

These tickets will be furnished by the Secretary of State only upon payment of the cost thereof. The law contains no provision for delivering to the Secretary of State an authentic copy of the names of candidates chosen by the political parties. But this is not necessary. The object can be accomplished without it. No more difficulty can arise in furnishing the names to the Secretary of State than has heretofore existed in furnishing them to parties who were to attend to the printing of the tickets. It is fair to presume that the Legislature intended that the same methods should be used in the one case as in the other. The statute is silent as to whose duty it is to file a ticket with the county clerk. It is immaterial whether this act is performed by the Secretary of State or by the proper committees of the political parties. The law is satisfied if done by either. Certainty of performance would suggest that it be done by the Secretary of State. The printing of the tickets is not to be done at the expense of the State, and therefore is not governed by section 22 of Article 4 of the Constitution. The Secretary of State is therefore not compelled to procure the printing to be done at the State printing-office. He may have it done wherever he chooses. It would, in my judgment, be not only proper, but wise, if the tickets were furnished at public expense. Tickets are as necessary in elections as are ballot-boxes and polling places. There is no good reason, in my judgment, why either should be furnished at the expense of candidates, private individuals, or political parties.

3. It is said that there are political parties which have county tickets in the field, but no State tickets. If such parties choose to vote only a county ticket, they can prepare their vignette or heading, prepare their tickets, deposit one with the county clerk, as provided by section

10, procure their printing by the Secretary of State, and deposit the ballots with the inspectors. If they choose to vote the State ticket of any of the other political parties, they can erase the county ticket, and paste their own in its stead.

Section 30 contains a very important provision of the law which has not been mentioned or argued by counsel. It is as follows:

"The board of election may make such regulations as they deem proper, limiting the time in which an elector may remain in the room or booth while preparing and voting his ballot; such limitation, however, shall not be less than one nor more than five minutes."

This section is not enumerated in the act among those sections which apply to municipalities whose elections are governed by special enactment. But it is evident that the Legislature intended this provision to apply to such elections. Great abuses might result if this provision did not apply. We therefore hold that this provision is applicable to the elections in such cities as well as to elections in towns, and that it is the imperative duty of such boards to limit the time as therein provided. Ample authority is conferred on the gate-keeper and the inspectors of election to see that this reasonable rule is complied with by the voters, and it is their imperative duty to enforce it.

The defects in the law can be very easily remedied by a future Legislature, and further safeguards provided for the protection and exercise of this most precious right, which is the key-stone of a free, honest, and enduring republican government.

The writ of *mandamus* must issue. This is a friendly proceeding to obtain a construction of the law, and no costs will be allowed.

CHAMPLIN, C. J., MORSE and LONG, JJ., concurred. CAHILL, J., did not sit.