## BOARD v. DILL.

No. 1043.    Opinion Filed April 19, 1910.

1.  **APPEAL AND ERROR — Case-Made — Sufficiency.** Where a record constituting a purported case-made is filed in this court in two parts, marked respectively "Part 1," and "Part 2," each bearing the title of the case, filed on the same day under the same number by the clerk of this court, and Part 1, to which is attached the petition in error and the certificate of the trial judge signing and settling the same, contains unmistakable reference to Part 2, the same will be considered as one record.

2.  **APPEAL AND ERROR—Findings of Court Unsupported by Evidence.** In a case tried to the court where on request findings of fact are made, and it is contended in this court that there is no evidence to sustain certain material findings, but that all of the evidence negatived the same, this court will on proper assignments examine the record for the purpose of ascertaining that fact, and where such contention is sustained by the record, such finding will be set aside.

3.   **ELECTIONS—Secrecy of Ballot — Mandatory Provisions.** The primary purpose and object of the Australian Ballot election law is to secure the independence of the elector by requiring of him the exercise of his right of franchise in absolute secrecy, and statutes, mandatory in their character, designed to accomplish this end, are mandatory on both the officials and the electors.

4.   **SAME—Rejection of Exposed Ballots.** Section 44 of Chapter 33, par. 2949, Wilson's Revised & Annotated Statutes of Oklahoma, 1903, providing that "any elector who declares that by reason of physical disability or inability to read the English language, he is unable to mark his ballot, may declare his choice of candidates to the poll clerks, who in the presence of the elector and in the presence of each other shall prepare the ballots," is mandatory as to such clerks, the electors, and all others, and ballots of electors prepared with the assistance of any other person, are invalid and fall within the provisions of sec. 5, chap. 17, Session Laws of Oklahoma, 1905, which provides for the exclusion of any exposed ballot except when made out by the poll clerks as provided above.

5.   **SAME.** Where electors voluntarily permit other persons than the authorized or acting poll clerks to assist them in the preparation of their ballots, the said ballots will be held to be intentionally exposed and will be rejected.

(Syllabus by the Court.)

*Error from District Court, Okfuskee County; Frank M. Bailey, Judge.*

Action by Ralph A. Dill against Charles W. Board. Judgment for plaintiff, and defendant brings error. Reversed.

*Crump, Rogers & Harris, Bailey & Wyand,* and *J. B. Patterson,* for plaintiff in error.—On question of exposure of ballots and mandatory statutes: *Rhodes v. Driver,* 64 S. W. 273; *Kirkpatrick v. Board of Canvassers,* 44 S. E. 465; *Mouck v. Brown,* 81 N. W. 313; *Attorney General v. May,* 99 Mich. 538; *People v. Board of Canvassers,* 129 N. Y. 395; *People v. Board of Supervisors,* 135 N. Y. 522; *Phelan v. Walsh,* 62 Conn. 260; *Baxter v. Ellis,* 111 N. C. 124; *Spurgin v. Thompson,* 37 Neb. 39; *Bechtel v. Albin,* 134 Ind. 193; *In re Ballot Marks* (R. I.) 27 Atl. 608; *Rampendahl v. Crump,* 24 Okla. 873; *Incorporated Town of Westville v. Town of Stillwell,* 24 Okla. 892.

*J. H. Burford* and *F. B. Burford,* for defendant in error.—On conclusiveness of findings of trial court: *Gibbs v. Gibbs,* 18 Kan. 419; *Darlington, etc., Co. v. Lobsitz,* 4 Okla. 355; *Electric Light Co. v. Jennison,* 5 Okla. 759; *Holcomb v. Dowell,* 15 Kan. 378; *Briggs v. Egan,* 17 Kan. 591; *Hunter Really Co. v. Spencer,* 22 Okla. 155; *Eager v. Seeds,* 21 Okla. 524. On question of mandatory provisions in election statutes: *Barnes v. Supervisors,* 51 Miss. 305; *State v. Russell,* 34 Neb. 116; *Marion v. Territory,* 1 Okla. 240; *Jones v. State ex rel.,* 153 Ind. 440; *Halls v. Schvenecke,* 128 Mo. 661; *State v. Gay,* 59 Minn. 6; *Hanscomb v. State,* 10 Tex. Civ. App. 638; *Moore v. Sharpe* (Tenn.) 41 S. W. 587; *In re Walker,* 3 Luzerne Leg. Reg. (Pa.) 130; *Hope v. Flentge,* 140 Mo. 390; *Harris v. Palmer,* 25 Okla. 770; *Petit v. Tenell,* 113 Ky. 777; *Rexroth v. Schein,* 206 Ill. 80; *Hayes v. Kirkwood,* 136 Cal. 393; Paine, Elections, sec. 487; McCrary, Elections, sec. 200; *Patton v. Watkins,* 131 Ala. 387; *Atkinson v. Lorbeer,* 111 Cal. 419; *McClelland v. Erwin,* 16 Okla. 612; *Robertson v. Hubler,* 11 Okla. 297; *Town of Grove v. Haskell,* 24 Okla. 707; *Tarbox v. Sughrue* (Kan.) 12 Pac. 935.

DUNN, C. J. This case presents error from the district court of Okfuskee county, wherein Ralph A. Dill was plaintiff, and Charles W. Board was defendant. The object of the action was to determine who was elected register of deeds of that county in the election held September 17, 1907. The controversy has been by the parties narrowed down to the vote of Van Zandt precinct, one of the voting places in that county. In this precinct, according to the returns made by the election board, the plaintiff Dill received 403 votes, and the defendant Board, 14. This precinct was not canvassed by the board of county commissioners, and as a consequence the vote acknowledged and declared as between these parties in the county was Dill, 760, Board, 1137. If Van Zandt precinct shall be received and counted, it will give Dill 1,163, and will give Board 1,151, making a difference of 12 votes in favor of Dill. The trial court held that the canvassing board was in error in rejecting the returns from this precinct and that the same

should be canvassed, and it is to reverse this holding that the cause has been brought to this court.

Two grounds are relied on by counsel for plaintiff in error for a reversal. The first is that the board organized to hold the election in this precinct was neither a *de jure* nor *a de facto* board, and that those who occupied the places of election officers were usurpers without color of office or authority. An examination of the findings of the court and the record in our judgment do not sustain this claim, but from the view we take of the entire case we do not deem it essential to pass on it, and we will, for the purpose of this decision, assume the board to have been legal.

The second ground for reversal is raised by the finding by the court as follows:

"The court further finds that judges and clerks indiscriminately directed voters in the preparation of their ballots and that a majority of the votes cast were prepared under the direction of judges and clerks, one judge or one clerk assisting the electors.

"The court further finds that in such Van Zandt precinct the plaintiff received 403 legal votes, and the defendant received 14 legal votes, and that in the county of Okfuskee and state of Oklahoma, plaintiff received in said election, 1,163 votes and defendant received 1,151 votes, and judgment will be rendered for the plaintiff."

It is counsels' contention that no one except the clerks of the election board can legally assist any voter to prepare his ballot, and that the ballot of any elector which is prepared with the assistance of the judges or any one else than the clerks is void and should be excluded from the count as the elector, by permitting a judge to thus assist him in the preparation of his ballot instead of a clerk, intentionally exposes the same.

It will be noted that the finding of the court upon the question of the number of voters assisted by the judges or by the clerks contains no statement as to the number prepared by each. Preliminary to the consideration of the question upon its merits, however, two propositions are raised and insisted upon by counsel for defendant in error which require notice. The first is that the

evidence taken and considered by the trial court on the hearing of the case has not been properly brought to this court and is not before us. It appears that the instant case was one of several election contest cases which were tried in that county under the same issues and facts as are here involved. One of these, Ball v. McCulley, had been tried and the evidence preserved and at the inception of this case counsel for both parties entered into the following several stipulations:

"It is hereby stipulated by and between the parties to the above entitled action that the parties to this action are each duly qualified to hold the office of register of deeds of said county, and that the evidence as shown by the stenographer's transcript in the case of H. M. Ball v. Wm. N. McCulley, Case No. 5, pending in said court shall be accepted and considered as the evidence in this case, and it is agreed that the parties hereto received the following vote in said county, exclusive of Van Zandt precinct, to wit: Dill, 760 votes; Board, 1,137 votes, and that the vote for said parties in said Van Zandt precinct as shown by the certified returns from said precinct is as follows: for contestant, 406 votes, and for contestee, 10 votes, and the right to have said votes counted from Van Zandt precinct shall be determined from the evidence taken in the said case of H. M. Ball v. Wm. N. McCulley.

"(Signed)     Attorneys for respective parties.

"It is hereby stipulated and agreed by and between the parties hereto, that the evidence taken in the case of H. M. Ball v. Wm. N. McCulley may be used in the above entitled case, as to the evidence in said case, but each party reserves the right to introduce such other testimony as he may desire in addition to the testimony herein agreed upon.

"(Signed)     Attorneys for respective parties."

Under the foregoing stipulations the trial of this cause was had upon the evidence as shown by the stenographer's transcript in the case of Ball v. McCulley, which constitutes a typewritten record of evidence of nearly 500 pages. On the occasion of the filing of the petition in error and case-made in this court all of the record made in the instant case was compiled under one binding, while the record in the case of Ball v. McCulley was compiled under another binding, the first of which is marked "Part 1," and the

second of which is marked "Part 2," and both entitled in this case and identified by the same number in this court and filed together on the same day. The index to Part 1 refers to the transcript of the testimony in Part 2, giving the number of pages therein. The trial judge has attached to Part 1 the usual certificate and there is nothing to show that there was not at that time before him both Part 1 and Part 2 of the case-made, and in view of this evidence and the absence of any affirmative showing that the same is not a part of the case-made, and so duly considered by the parties and the judge who signed and settled it, we will not assume that it is not a part of the record as the case appears in this court. Moreover this court held in the case of *England Bros. v. Young et al.,* 25 Okla. 876, 105 Pac. 654:

"When a case-made or record is filed in the Supreme Court, if any evidence heard on the trial of such cause is omitted therefrom, such court may on its own motion order, within a reasonable time to be fixed by said court, that such omitted parts under the direction of the trial judge may be incorporated in the case-made with the same effect as if it had been incorporated at the beginning. See section 1, art. 4, c. 28, p. 322, Session Laws Okla. T. 1905. No appeal may be dismissed by reason of such omission until an opportunity for such correction has been allowed."

As there is no claim made that the evidence referred to was not that on which the case was tried and determined, and as we entertain no doubt on the subject, to sustain the contention of counsel would not result in a dismissal or affirmance of the case, but only in the delay incidental to a correction of the record. We therefore hold the record sufficient in this respect.

The second proposition is involved in the insistence of counsel for plaintiff in error that there is no evidence in the record sustaining the finding of the court that the clerks of the election board at any time assisted any of the electors in the preparation of their ballots and that the inspector, the judges, and one outside party who temporarily served in the place of one of the judges in his absence, assisted all of the voters who received help, and that this is the undisputed evidence of the record. A request was

made that the court make special findings of fact. There was no exception taken to the findings made by the court in the way of a motion to make them more definite and certain or to make other or different findings, and it is the insistence of counsel for defendant in error that plaintiff in error is concluded by the findings made, and that error can not be predicated upon failure to find facts unless a request for a special finding on each point is made in time, and that in this case there being no request by plaintiff in error for additional or other findings by the trial court, he is concluded by the findings made unless they are without any evidence to support them. If the voters were assisted, as is found by the court, by both the judges and the clerks, and assistance by others than the clerks is fatal to the ballots so prepared, and there is no showing as to how many voters each assisted, there might be grounds for contending that this court would presume, in order to sustain the judgment of the trial court, that a sufficient number were assisted by the clerks so that the judgment could not be reversed on the facts. The evidence shows that the names of the members of the election board were Bradley, inspector; Kennedy and Myers, judges; Hill and Morgan, clerks. It also shows that one Boucher, without being sworn, took the place of Myers, one of the judges, at about 3 o'clock in the afternoon of election day and continued to act until the closing of the polls. The testimony on the question as to which of the officials actually entered the booths and assisted the electors in the preparation of their ballots is shown to be substantially as follows:

Boucher, who took the place of Myers, judge, testified as follows:

"Q. Did you act inside the room as one of the officers for a while.? A. Yes, sir. Q. What time did you begin? A. Three o'clock. Q. Who was you working for? A. Charley Myers. Q. Were you sworn? A. No, sir. Q. Didn't take any oath of office? A. No, sir Q. What did you do in the room? A. I furnished the men with ballots as they came in to vote and helped them to make out their tickets. Q. How long did you usually remain in the booth? A. Two minutes, I guess. Q. Did you remain in there

until after the voter had stamped his ballot? A. Yes, sir. Q. Did you see any of the ballots stamped by the voter whom you went in the booth with? A. A number of them. Q. A number of them? A. Yes, sir. Q. About how many did you see stamped? A. Forty or fifty, I think. * * * Q. You state that you saw probably forty or fifty tickets that were voted, was your observation such as to enable you to state what particular persons were voted for after they had stamped their tickets, you stated in answer to one of Mr. Rogers' questions that you were able to see who some of them had voted for, is that a fact? A. Yes, sir; I could tell whether it was a Republican or Democratic ticket. Q. After you instructed them how to place the stamp on it and after they had stamped it, then did you inspect them close enough to observe where the stamp mark was? A. Yes, sir. Q. About how many of those did you observe close enough to tell how they had voted? A. I can not say. Q. As many as half a dozen? A. Yes, sir. Q. Do you say there was more than half a dozen that you saw after the stamp mark was placed on them? A. Yes, sir; practically all that I went in the booths with. Q. About how many did you go in the booths with? A. Forty or fifty. Q. You say practically all that voted? A. Yes, sir."

Myers, judge, whose place the foregoing witness took, testified as follows:

"Q. Did you assist any of the voters that day? A. Yes, sir. Q. State what you did in the way of helping the voters or assisting them? A. I didn't do anything, only showed him where to stamp his ballot. Q. You went in the booths with them? A. Yes, sir. Q. About what portion of the voters that voted did you go in the booths with? A. About one-third of them I suppose. Q. Who else assisted the voters in voting except yourself? A. Both the other colored men who was in there. Q. What are their names? A. Bradley and I don't know the other's name. * * * Q. About what portion of the voters that come there that day was assisted by the two negroes? A. More than one half I think. Q. How long did you remain in the booth when you would go in to assist them? A. Sometimes I would stay in there until they came out and sometimes I would not. Q. Of the number you went in with, what part of them did you see put the stamp on their tickets? A. I cannot tell the number, nearly everyone that I was with, I would say nearly all of them."

Hill, one of the clerks, testified as follows:

"Q. Who instructed the voters during the day? A. Kennedy and Bradley. . Q. Kennedy and Bradley? A. Yes, sir. Q. What offices did they hold? A. Judges and inspector. Q. They done the instructing? A. Yes, sir. Q. How many of the voters did they assist in making out their ballots? A. About a third of them, .I think. Q. Where did they go to assist them? A. In the booths. Q. How (long) did they remain in the booths with them? A. I cannot say. Q. Did they stay in there until the voter had voted? A. Yes, sir. Q. And then the judge and the voter would come out together, and the voter would go out the door and the judge would place his ballot in the ballot box? A. Yes, sir."

Counsel for plaintiff in error call our attention to the foregoing evidence, and rely upon it as being the only evidence introduced on the subject. Counsel for defendant in error in no way controvert the same, and a careful examination of the record does not disclose that there is any testimony to sustain the findings by the court .that either of the clerks at any time during the day assisted any of the electors in the preparation of their ballots. Boucher testifies that he assisted about forty or fifty of the electors and saw them stamp their ballots. Myers testified that he went into the booths and assisted in the preparation of the ballots of about one-third of the voters who voted there that day. Hill testified that Kennedy and Bradley, the other judge and the inspector, assisted about one-third of the voters in the preparation of their ballots, and the court finds from the evidence that a majority of the votes cast were with assistance.

The statutes which the questions raised by the foregoing facts involve, and which will be necessary to consider in order to determine, are as follows: Section 44 of chap. 33, par. 2949, Wilson's Revised and Annotated Stats. of Okla. 1903:

"Any elector who declares that by reason of physical disability or inability to read the English language, he is unable to mark his ballot, may declare his choice of candidates to the poll clerks, who in the presence of the elector and in the presence of each other shall prepare the ballot in the manner ·hereinbefore provided and on request shall read over to such elector the names of the candidates as marked. Any one making a false declaration under the provisions of this section shall be deemed guilty of a misdemeanor,

and upon conviction be fined in any sum not exceeding twenty dollars; and any poll clerk or poll clerks who shall deceive any elector in selecting or marking any ballot, or mark the same in any other way than as requested by said elector, shall be guilty of a felony and on conviction shall be imprisoned in the penitentiary for not less than one nor more than five years."

And section 5, chap. 17, Session Laws of Oklahoma, 1905, p. 234, as follows:

"If any elector shall intentionally expose his ballot or any part thereof to any person so as to disclose to him any of the candidates voted for or how said ticket has been stamped (except in cases where the ballot has been made out by the clerks as provided in section 44) such ballot shall not be deposited in the ballot box. A minute of such occurrence shall be noted on the poll lists and such person shall not be permitted to vote at said election. * * *"

By this it will be seen that we are again confronted with the eternal moot of whether an election statute is mandatory or directory. The perpetuity and virtue of popular government can only be secured and maintained by providing for the independence of the electors upon whose consent and will it exists. Widespread charges of improper influences, bribery, and corruption committed on the occasion of elections in many of the states of the Union, bringing in their wake defeat of the popular will and success to the corrupt schemes of designing men, brought about the election reform known as the Australian Ballot System. Elections prior to it were held by an open ticket system, under which secrecy was almost if not quite impossible, and dependent or corrupt voters were equally at the mercy and under the control of those who would use them for corrupt ends.

The Court of Appeals of New York, in the case of *People ex. rel. v. Board of Canvassers, etc.*, 129 N. Y. 395, says:

"We know that the principal mischief which the statute was intended to suppress was the bribery of voters at elections, which had become an intolerable evil, and this was to be accomplished by so framing the law as to enable, if not compel, the voter to exercise his privilege in absolute secrecy."

The Supreme Court of Michigan in the case of *Common Council, etc., v. Rush,* 82 Mich. 532, says:

"The secrecy of the ballot is the great safeguard to the purity of elections. The vote by ballot implies secrecy. This secrecy should not be confined to the time of depositing the ballot. It should accompany the voter through all the steps provided for the preparation of his ballot. Only in this way can he be freed from all intimidation, improper influences, reproach, and animadversion. When all knowledge of how he voted is the voter's own secret unless he chooses to divulge it, he is fully protected, and a free and honest vote will very uniformly be the result."

The Supreme Court of Appeals of Virginia in the case of *Pearson et al. v. Board of Supervisors, etc.,* 91 Va. 322, says:

"The object is to relieve the voter from every influence inimical to a free and deliberate exercise of the right of suffrage, to free him from all solicitation and annoyance, and to leave him a perfectly free agent to vote as to him seems best. These provisions seem to be not only reasonable, but well adapted to secure the end in view, so far as the voter is concerned who is able to prepare his own ballot. He goes to the judges, he receives an official ballot printed by authority of the state, upon which is found every office to be filled and every candidate for that office, whose name has been filed in accordance with the requirement of the law, and he retires to a booth where he is curtained off and secluded from all the world. No eye can see him and no ear can hear him; no evil agency can approach him; and, with these environments, he prepares his ballot, folds and delivers it to the judge, who, in his presence, places it in the ballot box. * * * The general scheme of the law is to secure the independence of the voter by secluding him within an isolated booth, surrounded by a neutral zone, within which none may enter save those charged with conducting the election."

Thus, it is seen that the general scheme of the system is to secure the independence of the voter by requiring him to cast his vote in secret. Secrecy is the fundamental underlying primary essential of the system, and is the one element and condition which, paramount to all others, cannot be destroyed without destroying the reform intended and re-establishing the evils it was designed to correct. Statutes which make, even incidentally, for its preserva-

tion and inviolability are seldom directory, and without exception, where the language will admit of it, are held to be mandatory. Yet, great as the demand for secrecy is, it is manfest that there is a point beyond which it may be carried, and qualified electors will be virtually disfranchised unless assisted, and the end to be attained defeated by the means provided; hence, our statute, as is seen, provides that any elector, who by reason of physicial disability or inability to read the English language is unable to mark his ballot, may declare his choice to the poll clerks and they may assist him. In such high esteem is the absolute secrecy of the ballot and the manner in which any elector may cast it held that many of the states have passed statutes requiring those who, by reason of physical or other disability, are unable to prepare their own ballots, to make oath to this effect before being permitted to secure assistance. Such a statute has Kentucky, and the Court of Appeals of that state in the case of *Major v. Barker,* 99 Ky. 305, had occasion to pass on the question as to whether the the taking of this oath was mandatory, and in that case it held in the syllabus as follows:

"The provision of section 1475 of the Kentucky statute requiring that a voter shall declare his disability on oath before his ballot can be marked for him by the clerk of the election, is mandatory to the voter, and a ballot so marked without the declaration on oath being made is an illegal vote, and should be excluded."

In the consideration of the case Judge DuRelle said:

"In our view the statute imperatively requires that the voter shall declare his disability on oath before his ballot can be marked for him by the clerk, and to permit the officers to assume, either from the voter's appearance or from his own alleged personal knowledge, that he is so disabled as to be unable to mark his own ballot, would be to open a door for wholesale evasion of the requirement of secrecy in the ballot. This rule may result in hardship to the individual voter in cases where the officers are neglectful of their duty in requiring the oath of disability to be made, but the requirement that the voter shall take the oath before his ballot can be marked and deposited in order that he may be punished if he makes a false declaration is in our judgment mandatory to

the voter. A ballot so marked, without the declaration on oath being made, is an illegal vote and should be excluded."

Michigan passed a statute which provides (sec. 32, Act No. 190, Laws of 1891):

"When any elector shall make oath that he cannot read English, or that because of physical disability he cannot mark his ballot, or when such disability shall be made manifest to said inspectors, his ballot shall be marked for him, in the presence of at least two of the inspectors, by an inspector designated by the board for that purpose, who is not a candidate on said ticket."

This statute was before the Supreme Court of that state in the case of *Attorney General ex rel., etc., v. May,* 99 Mich. 538, and the question presented was whether the ballots cast by certain electors who failed to take the oath prescribed were valid. The court, in the consideration thereof, said:

"These provisions were intended to secure the entire secrecy of the ballot, except so far as was absolutely necessary to enable such electors as could not read English to have assistance in marking it. The only test under this statute which the inspector, who is designated to assist the voter, can apply to determine whether the elector can read English, is that the elector shall make oath of the fact. No other test is permissible, and it is unlawful for any inspector to assist in marking a ballot for any elector who claims that he cannot read English until such elector shall have first made oath to the fact. The construction contended for by the respondent cannot be given. Such interpretation would allow a voter to be assisted upon his own mere statement that he could not read English, and give inspectors unlimited discretion to mark ballots. The intention of the Legislature was to limit the marking to those who made the oath, or to those who from physical disability could not mark them. This intent is evidenced by the other portions of the statute above quoted, as, by section 26, if the ballot is seen after it is marked by any other than the inspector lawfully assisting, so as to disclose any of the candidates voted for, such ballot shall not be received or deposited in the box; and, under section 45, a penalty by fine and imprisonment is imposed upon any one disclosing the contents of a ballot seen by him. These provisions are mandatory. * * * "

The foregoing discussion and authorities cited are applicable

to the propositions presented in this case to the extent that they show how jealously the courts guard the secrecy of the ballot. It cannot be exposed nor thrown open except *ex necessitate* as the result of a condition for which the voter alone and not the law is responsible, and it can then only when the voter himself declares it and solicits the assistance provided by law. Discussing this proposition, the Supreme Court of Appeals of Virginia, in the case of *Pearson et al. v. Board of Supervisors, supra,* said:

"It is obvious that one who, either from physical or intellectual blindness, is unable to read, is wholly incapable of voting by ballot without assistance from some quarter. The law recognizes this and seeks to provide for it. The electoral board of the county is, by the fifteenth section, required to appoint a special constable. * * * The vote by ballot *ex vi termini* implies a secret ballot. The secrecy of the ballot is a right which inheres in the voter and of which he cannot against his will be deprived. It must be, however, in some degree subordinate to the right to vote by ballot, of which it is but a part; and the main object, which is the right to vote, must not be defeated by a too rigid observance of the incidental right, which is that of secrecy. A blind man, or a man unable to read, must, in the nature of things, so far compromise the secrecy of his ballot as to invoke and obtain the aid of others in the preparation of his ballot; but as it would be a violation of confidence, were he to seek of a friend assistance on such an occasion, for that friend to betray the secret and disclose the vote, so it is a violation not only of confidence but of official duty for the constable to lift the vail of the secrecy which would be impenetrable, and violate the confidence which the law requires the voter to repose in him. The oath of office of the constable binds him to the performance of the duties imposed upon him, not only by statute, but by the Constitution. He must observe and respect all the rights of the voter; and among those rights not the least important is to have the secrecy of his ballot kept inviolate, and for a breach of this duty upon the part of the constable, he will become amenable to all the pains and penalties provided by law."

It may also be noted that our statute penalizes any one who wrongfully asks for assistance by providing (Sec. 2949, Wilson's Stats.) "any one making a false declaration under the provisions of this section shall be deemed guilty of a misdemeanor, and upon

conviction be fined in any sum not exceeding twenty dollars." Neither the Kentucky nor the Michigan statutes nor the one of this state has any provision requiring the rejection of ballots of electors who improperly secure assistance in their preparation; but, as we have seen in the states from whose decisions we have quoted, the courts of last resort have nevertheless held the ballots invalid, and we doubt not that such a precedent would be followed were the question presented under our own statute.

In line with this we may notice that sec. 4 of chap. 17, p. 233, Session Laws of Oklahoma, 1905, provides in substance, that on leaving the booth the voter shall deliver his ballot to the inspector or judge temporarily acting as inspector, and that such inspector shall forthwith, in the presence of the voter and members of the election board, etc., deposit the same in the ballot box. There is no provision of the statute providing that a valid ballot properly prepared shall be rejected for no other reason than that the same is delivered to another than the officer named in the statute, yet this court, where that question was raised in the case of *Rampendahl v. Crump,* 24 Okla. 873, 105 Pac. 201, held that the same was mandatory, and that ballots so polled should be rejected.

We have seen above that the laws of Michigan provide that after an elector, incompetent to act for himself, shall have made the oath provided for therein, the ballot shall be marked for him in the presence of at least two inspectors, and section 26 of the same act, which is very similar to our law, provides:

"If any elector shall show his ballot, or any part thereof, to any person (other than one lawfully assisting him in the preparation thereof), after the same shall have been marked, so as to disclose any of the candidates voted for, such ballot shall not be received or deposited in the ballot box. In case such elector shall so expose his ballot, his name shall be entered on the poll lists with a minute of such occurrence, and such elector shall not be allowed to vote thereafter at said election."

In the case of *Attorney General ex rel., etc. v. May, supra,* it appears that a number of ballots were marked for electors by others than the legally selected inspectors. On a proceeding being brought

to secure their rejection, the trial court instructed the jury that all such ballots were void and that it was contrary to law to deposit them in the ballot box or count or consider them in determining the result of the election. In the consideration of this instruction on appeal, the Supreme Court of Michigan said:

"The law aims to secure secrecy in the ballot, and does not attempt to disfranchise any voter. At the expense of this secrecy, and in order to enable electors to vote who are physically incapacitated from marking their ballots, the law provides a method for such aid, as well as to those who cannot read the English language. The law does not deprive these voters of any right, but rather secures to them aid in voting intelligently. It is plain and simple in its provisions. Every voter, however illiterate or however much incapacitated physically, has a method pointed out by which he may exercise his right of franchise. The law does not shut off any class of voters from the ballot, and, we think, this was designated by the legislature to accomplish the purpose specified in the Constitution. * * * Section 32 provides the only authority by which an elector may have a ballot marked. It has been quoted above. The marking can be done only by an inspector designated by the board for that purpose, and in the presence of at least two of the inspectors. Under this act, no other can lawfully mark ballots, and to no other can the ballot be exhibited, unless United States supervisors of election may see them when a member of Congress is to be elected. The court was therefore right in its interpretation of this act."

The same question arose in Tennessee, and on the consideration thereof in the case of *Moore v. Sharp*, 98 Tenn. 491, the Supreme Court said:

"The third assignment is that the court erred in not holding and decreeing those votes illegal where the ballots were marked by any person other than the voter himself or the officer holding the election. This assignment of error involves the proper construction of sec. 16 of what is commonly known as the Dortch Election Law, which provides, viz.: 'That any voter who declares to the officer holding the election that, by reason of blindness or other physical disability, he is unable to mark his ballot, shall, upon request, receive the assistance of the officer holding the election in the marking thereof, and such officer shall certify on the outside that it was so marked with his assistance, and shall give no infor-

mation in regard to same.' The circuit judge held, under this section, 'that any ballot marked for a person neither blind nor physically disabled, is void, whether marked by the deputy sheriff or coroner, a judge, clerk, receiver, registrar, or any other person.' He further held that the deputy coroner or sheriff holding the election is the only person who can lawfully mark ballots for persons blind or otherwise physically disabled from marking their own ballot. The court held further that, while a blind man is presumed to know the law, yet he cannot be expected to always recognize the distinction between persons officiating at the polls. Hence, if a blind man, in good faith, and believing he is submitting his case to the proper officer, blamelessly allows his ballot to be marked by some other person, it should not be rejected. The assignment of error under consideration is that those votes are illegal where the ballots are marked by any person other than the voter himself or the officer holding the election. This is precisely what the circuit judge held, with this qualification, that if a blind man, without fault on his part, allows his ballot to be marked by an unauthorized person, believing him to be the officer holding the election, his ballot is not thereby rendered void. In this ruling there was no error."

In addition to the foregoing authorities, see, also, *McQuade v. Furgason*, 91 Mich. 438; *Attorney General ex rel. v. McQuade*, 94 Mich. 439; *Vigil v. Garcia*, 36 Colo. 430; *Freeman et al. v. Lazarus et al.*, 61 Ark. 247, 32 S. W. 680.

The logic and the reasoning of the foregoing authorities appear to our minds to establish the mandatory character of this statute beyond the realm of real controversy. Further consideration of the election statutes, taken in connection with the foregoing discussion, tends to confirm us in the conclusion that the clerks alone possess the authority to assist in the preparation of electors' ballots. As we have observed, the purpose of the Australian Ballot System is to make for the honesty of elections. This was to be attained by securing the independence of the elector through the secrecy of his ballot. Section 5 of the statute above quoted shows how jealously this secrecy is guarded. An elector preparing his own ballot cannot intentionally raise this veil except by sacrificing his right to vote. There is, as we have seen, but one statutory exception to this

absolute rule, and this is contained in the law we are considering. Sec. 53 of chap. 33, par. 2958, Wilson's Statutes of Oklahoma, provides:

"If any person being a member of an election board, or otherwise entitled to the inspection of the ballots, shall reveal to any other person how an elector has voted, or what other candidates were voted for on any ballot bearing a name not printed thereon by the board of election commissioners, or give any information concerning the appearance of any ballot voted, such person so offending shall be deemed guilty of a felony and on conviction shall be imprisoned in the penitentiary for a period not exceeding five years."

Par. 2961 of the same statutes provides:

"No officer of election shall disclose to any person the name of any candidate for whom any elector has voted. No officer of election shall do any electioneering on election day. No person whatever shall do any electioneering on election day within any polling place or within fifty feet of any polling place. No person shall apply for or receive any ballot in any polling place other than that in which he is entitled to vote. No person shall show his ballot after it is marked to any person in such a way as to reveal the contents thereof, or the name of any candidate or candidates for whom he has marked his vote; nor shall any person examine a ballot which any elector has prepared for voting, or solicit the elector to show the same. No person, except an inspector of election, or judge, who may be temporarily acting for him, shall receive from any voter a ballot prepared by him for voting. No voter shall receive a ballot from any person other than one of the poll clerks, nor shall any person other than a poll clerk deliver a ballot to an elector to be voted. No voter shall deliver any ballot to an inspector except the one he received from the poll clerk. No voter shall place any mark upon his ballot, or suffer or permit any other person to do so, by which it may be afterwards identified as the one voted by him. Whoever shall violate any provision of this section shall be deemed guilty of a felony, and upon conviction shall be punished by imprisonment in the penitentiary for a period not exceeding five years, or by a fine not exceeding three hundred dollars, or by both such fine and imprisonment, at the discretion of the court."

It will be noted that these penal sections of the election stat-

ute make felonies out of certain prescribed acts of all election officials and other persons as well as electors connected with the election. No specific official is named, but the entire board as well as all other persons are included generally within the penalty. This is not true, however, when it comes to the specific officials with which we are now dealing. Attention is called again to section 5, which provides for the rejection of any ballot intentionally exposed, except in cases where the ballot has been made out by (not a member of the election board but by) the clerks as provided in section 44. Herein is a specific definite limitation to certain particular officials who may see the ballot and yet its validity be not destroyed. Further, attention is also called to the latter clause of section 44, which provides a penalty (not for any member of the election board, judges, inspector, or other person, but for) any poll clerk or poll clerks who shall deceive any elector in selecting or marking any ballot. He, it is declared, shall be guilty of a felony, and on conviction be imprisoned for not less than one year nor more than five years. We do not pass on the question, for we need not, of whether a judge, inspector, or other person could be convicted for violating this section, but we submit that when the act condemned is deemed to be a crime of such a grade and character that it is denounced a felony, the Legislature would certainly have brought within the scope of its operation every one whom it regarded as being possibly subject to it. If it were deemed tolerable that under any contingency others than the clerks were to be permitted to assist in the preparation of the ballots, then the act would have been made sufficiently broad to have included them; and this is especially true when the other penal statutes to which we have referred are considered. Therefore when these two sections, dealing with the deception of voters and the exposure of ballots, are taken together and placed in contrast to the other penal acts, we submit that there can be left no doubt whatever that the clerks and the clerks alone are entitled to see the ballots of the electors or to assist in their preparation, and that the exposure of ballots to the judges, inspector or any other persons, renders them invalid, and

not proper to be deposited or counted. It seems to us there is a substantial reason for the rule. These highly trusted officials can be chosen with that purpose and end in view; men of discretion and known probity and integrity can be selected, and electors requiring assistance, attending upon the polls may ascertain and learn in advance to whom they will be required to expose their choice in order to be entitled to enjoy the right of franchise. Under the undisputed evidence and the findings of the .court, this. conclusion on our part results in a reversal of the judgment of the trial court.

The cause is accordingly remanded to the district court of Okfuskee county, with instructions to set aside the judgment heretofore rendered and enter one in accordance with this opinion.

All the Justices concur.