# WILLIAM E. McEWEN v. WILLIAM I. PRINCE.[1]

May 15, 1914.

Nos. 18,588—(121).

**City of Duluth — vote of unregistered voter.**

1. Under the Duluth charter unregistered voters may vote at the municipal election upon presenting corroborated affidavits showing that they are qualified voters. Where a duly qualified voter presented such affidavit and was permitted to vote, and no taint of fraud or bad faith appears, his vote is not invalid because one of his corroborating witnesses, who believed and testified that he was a freeholder, in point of law was not such, nor because the judge of election, who in fact administered the oath and received and retained the affidavit, neglected to sign the jurat thereto.

**Same — affidavit of voter.**

2. Where the voter signs such affidavit in a blank space left for the insertion of his name, it is sufficient, although he fails to sign at the end thereof.

**Marking ballot of voter.**

3. If a voter, without making oath that he is unable to mark his ballot himself, procures another to mark it for him, such ballot is void.

**Preferential voting — counting ballots.**

4. The ballot, in accordance with a charter requirement, provided for preferential voting and for three classes of votes, arranged in separate columns, and designated "first choice," "second choice" and "additional choices." The charter requires the votes of each class to be counted and canvassed separately, and no votes in one class can be counted in another class.

William E. McEwen served and filed notice that he appealed to the district court for St. Louis county from the decision of the Common Council of the city of Duluth acting as a canvassing board of votes cast at the general municipal election held on April 1, 1913, whereby that board certified that contestant received 1,351 first choice votes, 806 second choice votes and 969 additional choice votes, William I. Prince received 1,546 first choice votes, 947 second choice votes and 639 additional choice votes, and declaring William I. Prince elected mayor.

[1] Reported in 147 N. W. 275.

Note.—The question of marking ballots is treated in note in 47 L.R.A. 808.

125 M.—27.

The appeal was heard by Cant, J., who made findings and ordered judgment that the contestee Prince was duly elected mayor. Contestant's motion for amended findings and for judgment in his favor or for a new trial was denied. From the judgment in favor of contestee Prince, and from the order denying his motion for a new trial, contestant McEwen appealed. Affirmed.

*Walter F. Dacey* and *Warner E. Whipple,* for contestant.

*O. J. Larson* and *Neil E. Beaton,* for contestee.

TAYLOR, C.

In December, 1912, the city of Duluth adopted a home rule charter which established a commission form of government for that city, and provided for the election of a mayor and four commissioners on the first Tuesday in April, 1913. The charter provided for "preferential" voting and for the following form of ballot:

| For Mayor<br>Vote for one first choice | First Choice | Second Choice | Additional Choices |
|---|---|---|---|
|  |  |  |  |
| For Commissioners<br>Vote for first choices<br>or ballot will be void |  |  |  |
|  |  |  |  |
| For Other Officers |  |  |  |
|  |  |  |  |

For each office to be filled, the voter is allowed to designate, in the first column at the right of the names, one and only one "first choice," in the second column, one and only one "second choice," but in the third column he may designate as many "additional choices" as he sees fit. Only one choice can be counted for any one candidate. If a candidate for any office has received more than one-half of all the "first choice" votes for that office, he is elected. If no candidate has received more than one-half of such "first choice" votes, the "second choice" votes are added to the "first choice" votes, and, if any candidate has received more than one-half of the combined first and second choice votes, he is elected. If no candidate has received more than one-half of such combined first and second choice votes, the "additional choice" votes are added to the first and second choice votes, and the candidate then having the highest number of votes is elected. If two or more officers are to be elected, as in the case of commissioners, the same rule is followed with such modifications as are necessary to make it applicable.

At the election there were 10 candidates for mayor. No candidate received a majority of the first choice votes, nor of the combined first and second choice votes; and, after adding together all three classes of votes, the canvassing board found that William I. Prince had the highest number and declared him elected. A contest was duly instituted by William E. McEwen, and, as a result thereof, the trial court found that the total number of votes of all three classes cast for McEwen was 3,141, and the total number of such votes cast for Prince was 3,149, and that Prince had received the highest number of votes and had been elected. The contestant made a motion for a new trial which was denied; and judgment was rendered to the effect that Prince had been duly elected as, and is, mayor of said city. The contestant appealed from the judgment and also from the order denying a new trial.

Section 38 of the city charter provides for registering the names of voters and further provides: "No person shall be allowed to vote at any municipal election unless his name be registered as herein provided, except that any qualified voter of the city, whose name does not appear among the registered voters, may, at the time he offers his

ballot on election day, deliver to the judges of election his affidavit in which he shall state" (certain prescribed facts showing his qualifications to vote), "which said affidavit shall be substantiated by the affidavit of two freeholders and electors in such district, corroborating all the material statements therein, and in case any person offering to vote at such election shall submit such affidavit so corroborated, the judges of election shall receive his vote although his name does not appear upon the registration rolls." At the election a large number of voters who were not registered presented affidavits under the above provision and were allowed to vote. Blank forms of affidavit had been provided and were furnished by the election officers, and no question is raised as to the sufficiency of the form. Contestant, however, points out three persons who executed affidavits as corroborating witnesses and did not possess the legal title to any real estate within the precinct, and insists that for that reason the affidavits were void and the votes of the persons presenting them illegal. One of these witnesses, together with his family, had resided for more than 30 years upon a lot conveyed to his wife by her father as the consideration for an agreement between the witness and his wife on the one part, and the old gentleman on the other part, to support the latter and his wife during their declining years. Another of these witnesses had purchased and paid for a parcel of real estate with his own funds, but had taken the deed in the name of his wife. This land was, in fact, in an adjoining precinct a few feet from the line between the two precincts, but the witness supposed that it was in the same precinct in which he resided. The other of these witnesses had been the administrator of the estate of his mother and, under license of the probate court, had sold two lots belonging to the estate. They were purchased at the sale in the name of his sister under a verbal agreement that he and the sister should own them jointly. Both he and his sister resided upon the lots, and both recognized the joint ownership, but no conveyance had been executed to him by the sister. At the time of making the affidavits in controversy, all three stated they were freeholders, and apparently believed in good faith that such was the fact. Indeed, when testifying at the trial, they still insisted that the land belonged to them

in whole or in part. Nothing appears to impugn the good faith of the voters who relied upon such affidavits.

Contestant also points out five affidavits as defective, for the reason that no official signature is attached to the jurat thereto. This is true, but it affirmatively appears that each of these affidavits was presented to a judge of election at the time the voter received his ballot, and was in fact sworn to before such judge, who took and thereafter retained the affidavit, but, in the press of business, neglected to affix his signature thereto.

Contestant also points out two affidavits as defective because not subscribed by the voter at the bottom thereof. The affidavit begins with the word, "I," followed by a blank space in which to insert the name of the voter, and in each of these cases the voter himself wrote his name in this space, as and for his signature, instead of writing it at the bottom of the affidavit. The signature was sufficient.

Contestant also points out one affidavit as defective because, in the blank space left for the insertion of the number of the ward, the wrong number had been inserted, and, in the blank space left for the insertion of the name of the city, the name of the county had been inserted. The affidavit further stated that the voter resided in the precinct in which he offered to vote, at 1107 East Third street. As it showed exactly where the voter resided and this was within the precinct, the affidavit was properly received notwithstanding the above errors.

Contestant urges with much force and ability that the charter provisions in respect to these affidavits are mandatory, and, if the affidavits are not complete and perfect in form and substance, and executed by those technically qualified to execute them, that the votes of those who presented them were illegal and void. This is the position taken by the courts of some states, although under statutes perhaps somewhat different from our own. State v. Trask, 135 Wis. 333, 115 N. W. 823; Fitzmaurice v. Willis, 20 N. D. 372, 127 N. W. 95. But this court has not adopted the strict technical construction of election laws contended for by contestant.

The Constitution secures to every person possessing the qualifications prescribed therein the right to vote, "for all officers that now

are, or hereafter may be, elective by the people." Article 7, § 1. The legislature may, unquestionably, prescribe such safeguards and such rules and regulations in respect to the exercise of this right as are reasonably necessary to prevent fraud, to limit it to those possessing the requisite qualifications, and to insure a free and explicit expression of the will of the voter; but when it has appeared that an election was fairly and honestly conducted, and that the persons voting thereat in fact possessed the qualifications prescribed by the Constitution and had cast their votes in a good-faith attempt to exercise the right secured to them by the Constitution, and no taint of fraud or bad faith has appeared, this court has never held such votes illegal and void for failure to comply with some statutory regulation, unless required to do so by the unequivocal mandate of the law-making power. See, among others, the following cases: Taylor v. Taylor, 10 Minn. 81 (107); Edson v. Child, 18 Minn. 43 (64), and on reargument 18 Minn. 323 (351); Stemper v. Higgins, 38 Minn. 222, 37 N. W. 95; State v. Gay, 59 Minn. 6, 60 N. W. 676, 50 Am. St. 389; Pennington v. Hare, 60 Minn. 146, 62 N. W. 116; Hankey v. Bowman, 82 Minn. 328, 84 N. W. 1002; Truelsen v. Hugo, 87 Minn. 139, 91 N. W. 434; State v. Falk, 89 Minn. 269, 94 N. W. 879.

The election law of 1861 provided for making a registration list of the names of voters and further provided that "no person shall vote whose name is not upon the said list at the time of opening the polls * * * Provided, if any person offers to vote at such election whose name is not upon said list as aforesaid, and who is by all the judges of said election personally known to have all the qualifications of an elector in said precinct, and entitled to vote at such election, but whose name has been accidentally omitted from the said list, then the name of such person shall be added to the said list, and the said person shall be allowed to vote, but in all such cases an entry shall be made opposite the name of such person of the fact that the said name was inserted in said list after the opening of the polls." Chapter 15, § 5, p. 98, Laws of 1861. The act further provided that the canvassing board should not "refuse to include any returns in their estimate of votes for any informality in holding any election,

or making returns thereof, but all returns shall be received and the votes canvassed by such canvassing board and included in the abstracts provided for in this act." Chapter 15, § 43, p. 113, Laws of 1861. In contests brought under this statute in which it appeared that, in certain precincts, no registration list whatever had been prepared, and that no voters had been registered at the election, the court held that such registration was not essential to the validity of the votes or of the election. Taylor v. Taylor, 10 Minn. 81 (107); Edson v. Child, 18 Minn. 43 (64), and 323 (351). In the Taylor case Justice Berry dissented. In the Edson case he wrote the opinion and took occasion to say that his views were unchanged, but that the rule announced in the Taylor case had been acquiesced in so long that the court would not be justified in departing therefrom in the absence of legislation changing the rule.

The Duluth charter, in addition to the provisions already cited, provides in section 45 that: "No informalities in conducting municipal elections shall invalidate the same, if they be conducted fairly and in substantial conformity with the requirements of this charter." The charter discloses no legislative intent to change the rule, followed consistently since the decision of the Taylor case in 1865, that, where an election has been conducted fairly without taint of fraud or bad faith and only qualified voters have voted thereat, failure to comply with the regulations for conducting the election will not invalidate the votes so cast, unless the ballots were prepared or voted in a manner which the law declared should invalidate them. It is not claimed that, at the election in controversy, any person voted who in fact lacked the requisite qualifications to entitle him to do so; neither is it claimed that any taint of fraud or bad faith is imputable either to the voters, the election officers, the candidates, or to others. Under the charter provisions and the rule established in the Taylor and Edson cases, the irregularities in the affidavits, pointed out by contestant, were not sufficient to invalidate the votes of the persons presenting them and such votes were properly counted.

Contestant also asserts that in three instances a voter had another person mark his ballot without making oath that he was unable to mark it himself, and that he permitted such person to select the candi-

dates voted for thereon. As a matter of necessity, a voter unable to read English or physically unable to mark his ballot, may have another mark it for him; but if a voter who is capable of marking his own ballot, not only violates the rule of secrecy which is an essential element of an election by ballot, but also permits another to make out his ballot for him, the transaction bears an appearance of bad faith or dishonesty which justifies the exclusion of the vote. Hence the election law properly requires a voter to make oath as to his disability, before he can cast a ballot prepared by another. If he cast a ballot so prepared without making such oath, his vote is illegal. State v. Gay, 59 Minn. 6, 60 N. W. 676, 50 Am. St. 389. Neither can the one who marks the ballot be allowed to influence the vote; be must merely give expression to the will of the voter. Had either charge made by contestant been established, the votes in question should have been excluded, but the trial court found that neither charge had been proven, and the evidence sufficiently sustains such conclusion.

There are 68 ballots in which the voting cross-mark is placed opposite the names of two or more of the candidates for mayor in either the "first choice" column or the "second choice" column. It is conceded that these votes cannot be counted as either first or second choice votes, for the reason that the voter attempted to vote for two or more when he could vote for only one; but the contestant contends that, although they cannot be counted in the column in which they are placed, yet as the voter could indicate in the third column as many additional choices as he wished, they should be counted the same as if they had been placed in the third column. He argues that by placing the marks in the first or second column the voter indicated that he preferred the candidates so designated over the candidates whom he designated by marks placed in the third column; and, as they cannot be given effect in the column in which they were placed, they should at least be given the same effect as if they had been placed in the third column. In the section providing how votes shall be counted and canvassed the charter states: "If a ballot contain either first or second choice votes in excess of the number of offices to be filled, *no vote in the column showing such excess shall*

*be counted."* The charter also provides that there should be printed at the head of the ballot: "Vote only one first choice and only one second choice for any one office," and this notice was printed as so required. The trial court counted as additional choice votes all votes placed in the additional choice column, but declined to count as additional choice votes those placed in the first or second choice columns. The court followed the correct rule. The charter draws a sharp line of distinction between the three classes of votes, and requires them to be counted and canvassed separately, and to be considered separately. They differ in importance and the second and third classes, respectively, are to be given no effect unless there be a failure to elect by the preceding class or classes. The charter indicates unequivocally that neither class is to be counted in any other class, and, if there be an excess of votes in the first or second columns, that such votes shall not be counted at all.

Two ballots, which contestant claims should have been counted for him but were not so counted, remain for consideration. One of these clearly should be counted for contestant. The first choice upon the other should probably be rejected, for the reason that it cannot be determined with sufficient certainty for whom the voter intended it; the second and additional choices were not for contestant. But if this vote be counted for contestant it would not affect the result.

Both the judgment and the order denying a new trial are affirmed.