# E. H. NELSON v. RUTH BULLARD.[1]

May 18, 1923.

No. 23,426.

**Court's count of ballots was correct.**

1. Of 21 disputed ballots, referred to in the opinion, the court rightly counted 9 for the contestant, 6 for the contestee, and rejected 6 as either expressing no choice or as having identifying marks.

**Vote of school teacher properly deducted from contestee's total.**

2. The evidence sustains the finding of the court that a certain school teacher, who voted for the contestee, was not a legal voter in the precinct where she voted, and her vote was rightly deducted from the total counted for the contestee by the inspectors.

**Illegal vote should have been deducted from contestant's total.**

3. An elector, not a voter in the precinct where she voted, testified that she voted for contestant. The court refused to find for whom she voted. She was called as a witness by the contestant. Her testimony was positive, undisputed and unimpeached, and so far as the record shows was not improbable or inconsistent or discredited. Following Second Nat. Bank v. Donald, 56 Minn. 491, and other cases, it is *held* that the testimony should have been credited, that the illegal vote should have been found cast for the contestant, and that one vote should have been deducted from the total counted by the inspectors for contestant.

**Marked ballot cast without oath invalid.**

4. The requirement of G. S. 1913, § 463, that an elector, before receiving assistance in marking his ballot, must make an oath "that he cannot read English, or that he is physically unable to mark his ballot," is mandatory, and a ballot cast without such oath is invalid.

**Voter did not receive assistance and his vote rightly counted.**

5. Reviewing the evidence it is *held* that a certain voter, who voted for the contestee, did not receive assistance within the meaning of the statute, and that the court was right in refusing to deduct her vote from the total of the votes counted for the contestee.

[1]Reported in 194 N. W. 308.

Assisted voters.
> 6. Six voters received assistance. Two of them voted for the contestee. Whether the other four voted for the contestee is not determined, such determination being unnecessary to a decision.

E. H. Nelson gave notice of appeal and contest against the action of the county canvassing board in declaring Ruth Bullard elected register of deeds for Chippewa county at the November, 1922, election. The matter was heard by Qvale, J., who made findings and ordered judgment in favor of Ruth Bullard. From the judgment entered pursuant to the order for judgment, contestant appealed. Affirmed.

*Bert O. Loe, C. A. Fosnes* and *John C. Haave,* for appellant.

*J. O. Haugland* and *A. W. Ewing,* for respondent.

DIBELL, J.

At the November, 1922, election the contestant, E. H. Nelson, and the contestee, Ruth Bullard, were rival candidates for the office of register of deeds of Chippewa county. The county canvassing board found that Mrs. Bullard was elected. Upon appeal the district court found that she was elected. Judgment was entered accordingly on January 16, 1923. On the same day Nelson appealed from the judgment. No case was settled. This appeal presents for review the sufficiency of the findings to sustain the conclusion and judgment, but not the sufficiency of the evidence to sustain the findings. On January 22, 1923, Mrs. Bullard appealed, claiming that parts of the judgment determining certain votes against her, or in favor of Nelson, were erroneous. A case was settled on March 22, 1923. This appeal brings the evidence and the question of its sufficiency to sustain the findings. The two appeals were consolidated. They are considered together. The final question is whether the judgment is right in adjudging Bullard elected.

The inspectors appointed by the court found that Nelson received 2,463 votes and Bullard 2,466. A number of ballots were not counted by the inspectors. They were referred to the court. Seven

were absent voter ballots. They were not counted. Neither party complains. Thirty-one were undisputed at the trial. Nineteen of these were for Mrs. Bullard and 12 for Nelson, making 2,485 for Mrs. Bullard and 2,475 for Nelson, about which there is no question. Here the dispute starts. The court, considering the ballots returned, and certain votes claimed to be illegal, found that Nelson received 2,484 votes and Bullard 2,490.

1. There were 21 disputed ballots of which the court counted 9 for Nelson and 6 for Bullard. It found that 6 either expressed no choice or bore, identifying marks, and should not be counted for either party.

The court was right in its disposition of these ballots. They do not call for particular discussion. Seven were ballots used in Montevideo having printed thereon the names of the commissioners of another district, which were stricken out by pen or pencil. There is no question of how the voters intended voting. The others involve questions from time to time passed upon in other election contests as to the intent of the voter whose markings were not always certain, or marks claimed to be identifying in character.

2. The court held invalid the vote of Miss Anderson, a school teacher, who voted for Bullard in the precinct in which she was teaching. The holding was upon the ground that she was not a legal voter in that precinct. The evidence sustains the finding that she resided elsewhere with her parents. This vote the court rightly deducted from the total found by the inspectors for Bullard.

3. The court refused to find for whom Miss Rear voted. No one questions that she was not a legal voter in Montevideo where she voted. The pertinent inquiry is whether she voted for the contestant or the contestee or for neither. Her relevant testimony upon this issue is as follows:

"Q. Did you vote in Montevideo at the general election? A. Yes sir.

"Q. You voted down here in the city hall? A. Yes sir * * *

"Q. Who did you vote for for register of deeds A. For E. H. Nelson."

There was no cross-examination. Nothing further was developed. Her testimony was not disputed. No circumstances opposed to it were shown. It was not unreasonable.

In Second Nat. Bank v. Donald, 56 Minn. 491, 58 N. W. 269, Mr. Justice Mitchell stated the rule to be

"That in all cases the positive testimony of an otherwise unimpeached witness can only be disregarded when its improbability or inconsistency furnishes a reasonable ground for doing so, and this improbability or inconsistency * * * must appear from facts and circumstances disclosed by the evidence in the case. It cannot be arbitrarily disregarded by either a court or jury, for reasons resting wholly in their own minds, and not based upon anything appearing on the trial."

This rule was applied in Grover v. Bach, 82 Minn. 299, 84 N. W. 909, on the issue of the ownership of a note, and in Campbell v. Canadian Northern Ry. Co. 124 Minn. 245, 144 N. W. 772, upon the question of the effect of a failure to couple air in a train. If the evidence contains improbabilities or contradictions furnishing a reasonable ground for not believing it true, it may be rejected. Hawkins v. Sauby, 48 Minn. 69, 50 N. W. 1015; Anderson v. Liljengren, 50 Minn. 3, 52 N. W. 219. In Olsson v. Midland Ins. Co. 138 Minn. 424, 165 N. W. 474, a number of the cases are collated. As noted in a later part of the opinion circumstantial evidence is competent to show for whom an illegal vote was cast.

Here, so far as the evidence itself shows, the testimony of the witness was straightforward. She was the contestant's witness. To some extent he vouched for her trustworthiness when he produced her. He was not bound by her testimony. He could not impeach her by so-called direct impeachment; but he could show by other evidence that her testimony was untrue. If he was misled into calling her, supposing that her testimony as to the candidate for whom she voted would be different, he could have shown it and might have been permitted to cross-examine her. There was no suggestion of surprise. If she had said that she voted for Bullard her testimony would not be questioned. The only reason for con-

sidering it differently is that the answer was unfavorable to the questioner. That, without more, is not a circumstance justifying its rejection. The rule applied is a necessary one if an appellate court is to review the sufficiency of evidence to sustain findings of fact. The illegal vote should be held as one for Nelson and should be deducted from his total counted by the inspectors.

4. The remaining controversy concerns the votes of 7 voters. They are claimed by Nelson to be illegal because the voters had assistance in marking and did not take the prescribed oath. He claims they should be deducted from the Bullard votes reported by the inspectors. The trial court denied his contention. It found that these voters voted for Bullard, but that the statute prescribing an oath was not mandatory, and, there being no fraud, their votes should not be deducted from the count of the inspectors.

Our election law contemplates secrecy. A voter is not permitted to divulge to anyone within the polling place for whom he votes, or receive assistance in the preparation of his ballot except as specially authorized. Nelson relies upon G. S. 1913, § 463, which is as follows:

"When any voter states under oath that he cannot read English, or that he is physically unable to mark his ballot, he may call to his aid one or more of the judges, who shall mark his ballot as he may desire, and in as secret a manner as circumstances permit. When he also states that he cannot speak the English language or understand it when spoken, the judges may select two persons from different political parties to act as interpreters, who shall take an oath similar to that taken by the judges, and assist such person in marking his ballots. When he shall prefer, he may call to his aid any voter of the same district, who, unaccompanied by a judge, may retire with him to one of the booths and mark the ballot for him; but no person shall mark the ballots of more than three such voters at one election. Before depositing his ballot, such voter shall show it privately to either a judge or a clerk to ascertain that it is marked as directed; but a physically disabled voter who is able to determine for himself, need not show his ballot. No judge or other person so

assisting a voter shall in any manner request, persuade, or induce, or attempt to persuade such voter to vote for any particular party or candidate, but shall mark the ballot os requested, and shall not reveal to any other person the name of any candidate for whom the voter has voted, or anything that took place while so assisting him."

The statute just quoted is the one upon which the contestant relies to defeat the 7 votes. It was not an original ground of contest. It was brought in by amendment. It is the statute alleged to be violated; but as indicating the policy of secrecy we cite two other statutory provisions.

General Statutes 1913, § 465, provides:

"No voter shall divulge to anyone within the polling place the name of any candidate for whom he intends to vote or has voted, nor shall he ask for or receive assistance from anyone within the polling place in the preparation of his ballot, except as hereinbefore provided. When any voter, after having marked his ballot, shows it to anyone except as hereinbefore provided, the judges shall refuse to receive such ballot, but shall place it among the spoiled ballots, and, when such showing has clearly been intentional, no other ballot shall be delivered to such voter."

And G. S. 1913, § 459, provides that the voter, upon receiving his ballot or ballots, "shall retire alone to one of the booths and there prepare such ballot or ballots."

None of the 7 voters took an oath. They were not informed that an oath was required. Generally, though not in all cases, they needed assistance. There is no claim of fraud. The voters were legal voters at the precincts where they voted.

The doctrine that the requirement of an oath as a condition to receiving assistance is mandatory is accepted in this state. In State v. Gay, 59 Minn. 6, 60 N. W. 676, 50 Am. St. 389, an oath was administered. It was informal. The court held it sufficient. In commenting upon the statute requiring an oath the court said [at page 21]:

"We * * * wish to say in this connection that the provision of the law requiring the administration of an oath to such voters as claim the right to have their ballots marked by another person is mandatory, and must be strictly observed. An oath binding in form must be administered."

No vote was rejected for the want of a sufficient oath. If the oaths had been held insufficient a number of ballots sufficient to change the result would have been rejected. In McEwen v. Prince, 125 Minn. 417, 147 N. W. 275, the contestant alleged that 3 voters had their ballots marked without making oath that they were unable to mark them. The trial court found against his claim. This court said [at page 424]:

"As a matter of necessity, a voter unable to read English or physically unable to mark his ballot, may have another mark it for him; but if a voter who is capable of marking his own ballot, not only violates the rule of secrecy which is an essential element of an election by ballot, but also permits another to make out his ballot for him, the transaction bears an appearance of bad faith or dishonesty which justifies the exclusion of the vote. Hence the election law properly requires a voter to make oath as to his disability, before he can cast a ballot prepared by another. If he cast a ballot so prepared without making such oath, his vote is illegal. State v. Gay, 59 Minn. 6, 60 N. W. 676, 50 Am. St. 389. Neither can the one who marks the ballot be allowed to influence the vote; he must merely give expression to the will of the voter. Had either charge made by contestant been established, the votes in question should have been excluded, but the trial court found that neither charge had been proven, and the evidence sufficiently sustains such conclusion."

And the syllabus, prepared by the court, reads:

"If a voter, without making oath that he is unable to mark his ballot himself, procures another to mark it for him, such ballot is void."

These are the only cases where this court has expressed its views upon the question before us. Decisions in other states are helpful.

They are not necessarily controlling. Statutes differ. Policy may vary from state to state. Statutes such as that we are considering are by the weight of authority held mandatory. Attorney General v. May, 99 Mich. 538, 58 N. W. 483, 25 L. R. A. 325; McQuade v. Furguson, 91 Mich. 438, 51 N. W. 1073; Gill v. Shurtleff, 183 Ill. 440, 56 N. E. 164; McCreery v. Burnsmier, 293 Ill. 43, 127 N. E. 171; Huston v. Anderson, 145 Cal. 320, 78 Pac. 626; Patterson v. Hanley, 136 Cal. 265, 68 Pac. 821, 975; Manalo v. Sevilla, 24 Phil. Rep. 609; Vigil v. Garcia, 36 Colo. 430, 87 Pac. 543; Allen v. Griffith, 160 Ky. 528, 169 S. W. 1003; Hill v. Mottley, 142 Ky. 385, 134 S. W. 469; Major v. Barker, 99 Ky. 305, 35 S. W. 543; Hall v. Sumner, 194 Ky. 1, 238 S. W. 197, and cases cited. A different result was reached in Hope v. Flentge, 140 Mo. 390, 41 S. W. 1002, 47 L. R. A. 806; Montgomery v. Oldham, 143 Ind. 34, 42 N. E. 474; and Patton v. Watkins, 131 Ala. 387, 31 South. 93, 90 Am. St. 43. In North Dakota, in Grubb v. Dewing, 49 N. D.    , 187 N. W. 157, where the statute required a declaration of inability to mark the ballots, though not an oath, it was held that a ballot cast, without such declaration, by a voter unable to mark, was invalid. The same was held in Board v. Dill, 26 Okla. 104, 110 Pac. 1107, 29 L. R. A. (N. S.) 1170, Ann. Cas. 1912B, 101. These cases are in harmony with the law declared in our decisions.

We are committed to the general rule that effect should be given to the intent of the voter and that a failure to observe unimportant technicalities will not result in denying him the right of franchise. In this our holdings are not peculiar. Other states having the Australian system and holding secrecy an essential have the same rule. In Clayton v. Prince, 129 Minn. 118, 151 N. W. 911, Ann. Cas. 1916E, 407, we held that the provision of a city charter requiring an unregistered voter to deliver an affidavit of his qualifications to the judges was directory and that a failure to do so did not avoid the election. No question of secrecy was involved. A different holding would have brought a different result. The court said [at page 119]:

"From the beginning it has been the policy of the state to give effect to the votes of legal voters regardless of irregularities in the

election. This policy is illustrated by the case of Taylor v. Taylor, 10 Minn. 81 (107), and a long line of intervening cases down to the recent case of McEwen v. Prince, 125 Minn. 417, 147 N. W. 275, which reviews the prior cases."

In the McEwen-Prince case the same thought is expressed but developed at greater length with a collation of pertinent authorities.

Meritorious considerations are urged in support of each claim as to the proper construction of section 463. The illiterate voter does not likely know that the law makes it the duty of election officers to require an oath before giving him assistance. The election officers should know. It is said that a rigid adherence to the requirement will in some communities result in contests in close elections. This, however, is only the third case involving the particular point which has reached this court in the more than 30 years that our election law has been in force. It is desirable that every honest vote be counted. If the 7 voters voted for Mrs. Bullard, as the court found, it is unfortunate, so far as concerns this case, that any of them be rejected. The considerations just mentioned do not give a complete view of the situation. It is well that only those who are willing to take the oath of disability and can take it truthfully be permitted assistance. It is the declared legislative purpose. Considerations of broad general policy induced the requirement. If that policy is once ascertained it is only for the court to give it effect. The legislature, acting within its constitutional powers, is supreme in declaring policy. It might well determine that permitting election officers to mark ballots somewhat indiscriminately, somewhat as the whim of the voter may suggest that he have assistance, tends unduly to destroy secrecy and offers an opportunity for deceiving the elector or working a fraud on the public. In Gill v. Shurtleff, 183 Ill. 440, 445, 56 N. E. 164, 166, the court said:

"The vital purpose of our ballot system is twofold: First, to enable each voter to cast a secret ballot; and second, to require him to do so. The first of these purposes is for the protection of the elector; the last to preserve the purity of the ballot box by depriving the corrupt voter (as far as possible) of the power or opportunity

to satisfy others that he voted a particular ticket or for a certain candidate or measure. In view of the fact that in exceptional instances citizens who are lawfully entitled to vote might, by reason of the misfortune of illiteracy or of physical disability, be unable to' prepare their tickets, it was found necessary to provide they might have the assistance of others in marking their ballots. * * * It is by no means unreasonable to grant such a privilege only on condition the voter shall show by his oath that his condition or situation is such as to entitle him to it. We regard the provision as mandatory."

Those conversant with actual situations know that election officers, if permitted to mark ballots except under strict limitations, are in a position appreciably to affect results. They may easily become important factors in an election worthy the favor of ambitious candidates or competing parties. Secrecy is the foundation of our ballot system. It is significant that the courts have so generally reached the conclusion that the oath must be administered. We hold in accord with the general doctrine and the language of our prior decisions that a vote by an elector receiving assistance from one of the judges without taking the prescribed oath is invalid.

5. The trial court found in reference to the 7 voters as follows:

"Each of said voters called to his assistance one of the judges of election of his precinct, who aided in marking and marked his ballot as he, the said voter, desired such ballot to be marked, but no oath was taken by or administered to either or any of said voters before being so aided or assisted or at any time, nor were said voters or any of them advised or informed that such or any oath was a pre-' requisite to such assistance, and that each and every one of said voters so cast his ballot and voted for the contestee."

It is conceded that the voters were not sworn. It is contended by Mrs. Bullard that Mrs. Nesteby did not receive assistance.

Mrs. Nesteby was a qualified voter in Montevideo, and voted there. Her testimony bearing upon the question of receiving assistance is as follows:

Direct examination:

"Q. You voted here in Montevideo at the last election? A. Yes sir.

"Q. Did anybody go in with you and help you vote? A. I didn't need help, you know, for I knew what side I was standing on.

"Q. Who went in with you? A. No.

"Q. Who went in with you and helped mark the ballot? A. Gilbert Anderson.

"Q. You was not sworn before you went in, or that day at all, were you? A. No.

"Q. Who did you vote for for register of deeds? A. I voted for the lady.

"Q. Mrs. Bullard? A. Yes, sir, I don't remember the name.

"Q. You voted for the lady? A. Yes sir."

Cross-Examination:

"Q. You held the pencil and marked the ballot yourself, didn't you? A. Yes.

"Q. Gilbert Anderson didn't help you to mark the ballot? A. No, I knew where I was voting.

"Q. He didn't tell you how to mark it either? * * * A. No.

"Q. You made your own mark? A. Yes, I did."

Re-direct Examination:

"Q. You asked to have Gilbert go in with you? A. Yes."

It is clear that she was not in need of assistance and was not entitled to have it. Her testimony indicates that she does not always use accurate English and probably does not understand perfectly. It cannot be found, the affirmative of the proof being upon the contestant, that she received assistance within the meaning of the statute. It is not shown, even, that anyone saw her as she voted, or saw her ballot. Her testimony is that Anderson went to the booth with her. This should not have been. It is not shown, unless by inference, that he was one of the judges of election. He surely did not help or assist her. He did not see, so far as we know, how she voted. She did not divulge to him or to anyone how she voted. If she violated the statute as to secrecy in the respects claimed, a ques-

tion or two would have elicited the fact. There is no proof that her ballot was not secret, its markings known only to herself, and made without suggestion, and it was so easy to get the proof that it was not secret if that were the fact. Mrs. Nesteby's vote should not be held illegal and deducted from the count of the inspectors.

6. The contestee claims that Mrs. Olson did not receive assistance. The evidence sustains the trial court's findings that she did. The remaining 5 received assistance.

It is the contention of Bullard that the record does not show how 4 of them voted. They said, in general, that they told the marker for whom they wished to vote, but did not know how the ballots were marked. Those who helped mark the ballots were not called, except in one instance, to show whether instructions were followed. Mrs. Johnson assisted Mrs. Olson and Mrs. Schultz, and followed their instructions. Nothing was shown as to the 4. It is competent to show by circumstantial evidence for whom an illegal ballot was cast. Widmayer v. Davis, 231 Ill. 42, 83 N. E. 87; Rexroth v. Schein, 206 Ill. 80, 69 N. E. 240; Moore v. Sharp, 98 Tenn. 491, 41 S. W. 587; White v. Slama, 89 Neb. 65, 130 N. W. 978, Ann. Cas. 1912C, 518; Berg v. Veit, 136 Minn. 443, 162 N. W. 522. It is unnecessary for the decision of the case to determine how these 4 voters voted. Mr. Justice Hallam and Mr. Justice Quinn, however, are of the opinion that it cannot be found that the 4 voted for Bullard.

Counting the ballots of these 4 voters as Bullard votes, and as illegal, and deducting them from the total of the Bullard votes found by the inspectors, she is still elected. If they are not counted as Bullard votes, and not deducted, her majority is so much the greater. The judgment, so far as it finds that Bullard was elected, is affirmed.

Judgment adjudging contestee elected affirmed.

BROWN, C. J. and HOLT, J. (dissenting.)

We concur in the view that the finding of the trial court are in all respects sustained by the evidence, and that the rule of the Gay case, cited in the opinion, controls the question as to the validity

of the 7 ballots cast by illiterate voters, who were given assistance in marking them without taking the required oath of illiteracy. But if any of those so given assistance were not in need of the same, and were able to mark their own ballots, yet took some third person into the election booth with them on the claim to the election board that they did require help, there was in that act a fraud and deception, and a positive violation of the statutory requirement that each voter shall go into the election booth alone, necessarily, if any effect is to be given the statute at all, rendering the vote so cast illegal and void. If this be not so, then our present voting system is shorn of one of its principal safeguards to an honest expression of the electorate, free from interference by the local political precinct worker. It will not do to temporize with a statutory provision of this importance. The statute G. S. 1913, §§ 459 and 465, declares that the voter shall enter the election booth alone and there mark his ballot in secret, and forbids that he disclose or divulge to anyone within the polling place for whom he voted. It would be wholly destructive of the law to hold its violation immaterial, or that the voter guilty of a violation thereof may be heard to say in justification or excuse that the person taken by him into the election booth did not see or know for what candidate or candidates the ballot was marked. The statute is mandatory, the capstone of all provisions designed to guard and protect the secrecy of the ballot, of far greater importance than the requirement that an oath of illiteracy be taken before assistance in marking the ballot be extended to the voter, and should not thus by judicial decree be rendered meaningless and without purpose or effect.

The violation of the statute by one of the voters whose ballot is made to turn the election here in contest is conceded in the opinion, but is passed over as of no importance. In fact the court handles the important question presented with extremely tender caution, advancing as the main support of the conclusion reached, that with this vote counted the contestee "is still elected."

Thus the door is closed to the unfortunate ignorant voter, and the election booth thrown open to the machinations of the political

worker, enabling him by the subterfuge here sanctioned and approved, to deliver the votes contracted for, and do much to corrupt our elections, particularly in the large cities.

The conclusion of the court on this feature of the case in our view of the question is fundamentally erroneous, and we therefore respectfully dissent.